UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| JENNIFER S. JENKINS<br><br>Plaintiff,<br><br>v.<br><br>MEDICAL LABORATORIES OF EASTERN IOWA, INC.<br><br>Defendant. | CIVIL CASE No. 1:11-31-LRR<br><br>MEDICAL LABORATORIES OF EASTERN IOWA, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

Defendant, Medical Laboratories of Eastern Iowa, Inc., ("MedLabs"), provides the following Statement of Undisputed Facts in support of its Motion for Summary Judgment.

### MedLabs

1. MedLabs has a main laboratory and a number of outreach laboratories located throughout the Cedar Rapids metro area. (DEF APP pp. 90-91 - ¶3 and ¶6, Behr Affidavit).[1]

2. All patient care is administered on a walk-in basis, so it is not specifically known when a large number of patients may seek laboratory care at any given time. (DEF APP pp. 90-91 - ¶3 and ¶6, Behr Affidavit).

3. The MedLabs' professional staff are educated and trained to quickly and effectively deal with each patient thereby obtaining the appropriate bodily specimen(s), properly labeling said specimen(s), and finalizing the documentation regarding the

---

[1] References to DEF APP refer to Defendant's Appendix, filed simultaneously herewith.

patient and the testing done in order to ensure proper traceability. (DEF APP pp. 90-91 - ¶3 and ¶6, Behr Affidavit).

4. All samples are drawn and testing performed at MedLabs based upon a Physician Order. (DEF APP p. 90 - ¶4, Behr Affidavit).

5. The testing and analysis performed by MedLabs is used by the physicians for diagnosis and treatment of the patients. (DEF APP p. 90 - ¶4, Behr Affidavit).

6. The Marion laboratory was the busiest outreach location as it directly serviced the physicians/patients of the Marion Family Medicine and Urgent Care medical clinic which was located in the same building and, also, serviced the normal walk-in patients (DEF APP p. 91 - ¶7, Behr Affidavit).

7. Providing the highest quality of care to the patients is the mission of MedLabs, and all of the professional staff of MedLabs are expected to conduct themselves in accordance with this professional responsibility. (DEF APP p. 91 - ¶8, Behr Affidavit).

### Jenkins' Position with MedLabs

8. Jennifer Jenkins was hired by MedLabs in August 2007. (Petition ¶ 6).

9. Jenkins worked at MedLabs' laboratory in Marion, Iowa. (DEF APP p. 64 - Jenkins 21:9-21).

10. Jenkins' position was Medical Laboratory Technician. (DEF APP p. 64 - Jenkins 20:21-23).

11. Jenkins' responsibilities included drawing blood, testing blood, performing initial strep tests, preparing urine samples, ordering supplies, and

registering patients. (DEF APP p. 62 - Jenkins 13:9-24); (DEF APP p. 64 - Jenkins 20:24-23:2).

12. Jenkins' direct supervisor at MedLabs was Kristi Paterson. (DEF APP p. 66 - Jenkins 47:8-16).

13. Jenkins believed that she could openly communicate with Paterson and did in fact openly communicate with her from time to time during her employment with MedLabs. (DEF APP p. 66 - Jenkins 47:17-23).

14. Paterson appeared to be concerned about Jenkins as a person as well as an employee of MedLabs. (DEF APP pp. 66-67 - Jenkins 47:24-48:4).

15. Jenkins admits that Paterson is very nice, friendly, and very empathetic. (DEF APP p. 84 - Jenkins 152:15-25).

16. Jenkins felt that she could speak with Paterson about any concerns or issues. (DEF APP p. 84 - Jenkins 152:22-25).

**Jenkins' Back Condition in April 2009**

17. Prior to April 2009, Jenkins was diagnosed with a bulging disk in her lower back. (DEF APP p. 61 - Jenkins 10:1-12).

18. In April 2009, Jenkins' back condition was symptomatic, and this was reported to MedLabs (DEF APP pp. 61- Jenkins 10:15-17); (DEF APP p. 62 - Jenkins 14:10-14).

19. Jenkins began using a stool with greater frequency when performing phlebotomy procedures. (DEF APP pp. 61-62 - Jenkins 11:6-17, 13:5-14:4).

3

20. Jenkins admits that there was no concern, criticism or complaint from MedLabs regarding her use of the stool. (DEF APP p. 62 - Jenkins 14:5-14).

21. Jenkins asserted a workers' compensation claim based on the symptoms related to her back condition. (DEF APP p. 62 - Jenkins 14:15-17).

22. MedLabs assisted Jenkins in dealing with frustrations caused by the third-party administrator. (DEF APP p. 62 - Jenkins 14:18-15:8).

23. Jenkins' supervisor, Paterson, was the "go to" person in assisting Jenkins regarding the third party administrator. (DEF APP p. 67 - Jenkins 49:4-50:6).

24. Jenkins admits that Paterson was very good about making any necessary inquiries and seeing what she could do to assist with the workers' compensation claim. (DEF APP p. 67 - Jenkins 49:4-50:6).

### Jenkins' Work Restrictions in March 2010

25. On March 8, 2010, Jenkins was restricted to work in a seated position. (DEF APP p. 61 - Jenkins 10:23-11:5); (DEF APP 88 – March 8, 2010 Work Restriction).

26. Jenkins was not very happy about the initial restriction that limited her to working in the seated position, and she spoke with her physician to have the restriction eased to allow her to work while standing as well (DEF APP pp. 36-37 - Paterson 28:23-29:6).

27. On March 18, 2010, Jenkins was released to work in a sitting or standing position but was still restricted from working while in a bended posture (DEF APP p. 89 - March 18, 2010 Work Restriction).

28. In March 2010, Jenkins' supervisor Paterson contacted Jenkins' physician regarding how to best accommodate her condition. (DEF APP p. 68 - Jenkins 85:19-87:23). Jenkins admits that this contact reflects Paterson's concern regarding Jenkins and her condition. (DEF APP p. 68 - Jenkins 87:7-23).

29. Because of the further medical restrictions, Jenkins began to perform more of the patient registration function at the Marion laboratory. (DEF APP pp. 49-51 - Wernimont 31:10-33:17).

### Jenkins' Coworkers

30. Beth Shornhorst was one of Jenkins' coworkers at MebLabs' Marion laboratory. (DEF APP p. 94 - ¶6, Spratte Affidavit).

31. At all relevant times, Schornhorst worked from morning to early afternoon at the laboratory. (DEF APP pp. 19-20 - Schornhorst 4:24-5:1).

32. Before March 2010, Schornhorst had previously performed most of the patient registration function at the Marion laboratory. (DEF APP pp. 49-51 - Wernimont 31:10-33:17).

33. Schornhorst's temperament was unaffected when Jenkins began to perform more of this function. (DEF APP pp. 49-51 - Wernimont 31:10-33:17).

34. Schornhorst's temperament remained the same throughout 2010 (DEF APP pp. 49- 51- Wernimont 31:10-33:17).

35. Julie Martin was another of Jenkins' coworkers at the Marion laboratory. (DEF APP p. 94 - ¶6, Spratte Affidavit).

36. At all relevant times, Martin worked afternoons at the laboratory. (DEF APP p. 3 - Martin 4:17-22).

37. At one time, Jenkins, Schornhorst, and Martin were friendly and socialized outside the office. (DEF APP p. 94 - ¶7, Spratte Affidavit).

38. Jennifer Wernimont was another of Jenkins' coworkers at the Marion laboratory. (DEF APP p. 42 - Wernimont 5:1-13).

39. Wernimont was assigned to work mornings at the Marion laboratory due to the workload of walk-in patients during the morning hours. (DEF APP pp. 48-49 - Wernimont 30:23-31:9).

### Jenkins' Allegations regarding Negative Feedback

40. Jenkins alleges that after she was placed on the work restrictions in March of 2010, she was subjected to worsening "negative feedback" from her co-workers Schornhorst and Jenkins. (DEF APP p. 69 - Jenkins 89:2-90:6).

41. According to Jenkins, she was displeased with the work environment at MedLabs for approximately four weeks prior to April 9, 2010. (DEF APP p. 80 - Jenkins 138:19- 139:2).

42. Jenkins alleges that her coworkers Beth Schornhorst and Julie Martin did not respond when she asked them work-related questions, that the coworkers would slam doors, and that she felt intimated and a lack of respect. (DEF APP p. 69 - Jenkins 89:2-90:6).

43. Jenkins alleges that Schornhorst and Martin were "short" with her when answering work-related questions and further alleges that Schornhorst and Martin were

6

"annoyed" with her because she was on work restrictions. (DEF APP p. 80 - Jenkins 139:3-20).

44. According to Jenkins, "there was no chitchat like we were friends before" but instead "it was just very tense, very quiet, a very uncomfortable feeling." (DEF APP pp. 80-81 - Jenkins 139:3-140-5).

45. Jenkins admits that she never asked Schornhorst and Martin whether they were upset with her. (DEF APP p. 81 - Jenkins 143:14-22).

46. Jenkins never asked to be transferred out of the Marion lab. (DEF APP p. 85 - Jenkins 161:16-18).

47. Before April 9, 2010, Jenkins had never spoken with anyone at MedLabs or emailed anyone at MedLabs regarding any concerns regarding the work environment. (DEF APP p. 80 - Jenkins 136:22-137:4); (DEF APP pp. 81-82 - Jenkins 143:9-144:1); (DEF APP pp. 83-84 - Jenkins 149:24-152:14).

**Jenkins' Allegations regarding the Alleged Conduct on Friday, April 9, 2010**

48. Jenkins alleges that during the morning of Friday, April 9, 2010, her coworker Beth Schornhorst was slamming doors and drawers and stomping her feet. (DEF APP pp. 70-73 -Jenkins 99:20-111:24).

49. Jenkins alleges that when she asked Schornhorst a work-related question, she did not respond. (DEF APP pp. 70-73 - Jenkins 99:20-111:24).

50. Jenkins alleges that after her lunch break on April 9, 2010, she asked Schornhorst and Martin why they appeared to be upset with her. (DEF APP pp. 70-73 - Jenkins 99:20-111:24).

7

51. According to Jenkins, while Schornhorst was leaving the room to go to the restroom, she said that Jenkins was extremely selfish. (DEF APP pp. 70-73 - Jenkins 99:20-111:24).

52. When asked to describe how she felt on April 9, Jenkins testified:

Q. What did Julie Martin do on December 9 [sic] to make you uncomfortable?
A. You mean April 9th?
Q. I'm sorry, April 9.
A. I left like the two of them were in on something together. They were very good friends. I felt that Julie had always made me feel uncomfortable. I can't exactly put my finger on it, but –
Q. Have you finished your answer?
A. Yes.
Q. Okay. Are you saying, Ms. Jenkins, that you had a general unease around Julie Martin?
A. Yes.
Q. Nothing specific?
A. Actually she was very rude to patients. Patients would come in, get their blood work done, and she would bad-mouth them as soon as they left the room. As soon as they left she'd make fun of patients, so that's where my uneasiness came from.
Q. Did you ever report your concerns about her comments of patients to management?
A. No.
Q. Is there anything else that Julie Martin did to cause you concern or discomfort in the work environment?
A. No.

(DEF APP pp. 74-75 - Jenkins 115:15-116:17).

**Schornhorst's Testimony regarding Friday, April 9, 2010**

53. Schornhorst testified that the morning of April 9th had been a typical busy morning. (DEF APP pp. 21-26 - Schornhorst 14:17-19:7).

8

54. In the afternoon of April 9th, "out of the blue" Jenkins suddenly became upset and proceeded to walk toward Schornhorst yelling at her, and getting within a foot while Schornhorst retreated. (DEF APP pp. 21-26 - Schornhorst 14:17-19:7).

55. Schornhorst told Jenkins to back away from her and then stepped out into the patient waiting area. (DEF APP pp. 21-26 - Schornhorst 14:17-19:7).

56. Shortly thereafter, Jenkins left the laboratory (DEF APP pp. 21-26 - Schornhorst 14:17-19:7).

### Julie Martin's Testimony regarding Friday, April 9, 2010

57. Julie Martin testified that she did not arrive at the Marion Laboratory until her scheduled time of 12:00 Noon on Friday, April 9. (DEF APP p. 4 - Martin 14:21-25).

58. Martin described the early afternoon as "really quiet" during which time she was reading a book, Schornhorst was on the internet; and Jenkins was reading a magazine. (DEF APP pp. 5-6 - Martin 16:12-17:12).

59. Martin then described that while all three sat in silence, Jenkins became upset and slammed her magazine down, shortly followed by Jenkins standing up and pursuing Schornhorst while yelling at her, thereafter followed by Jenkins getting her purse and leaving. (DEF APP pp. 7-10 - Martin 19:5-22:23); (DEF APP p. 94 - ¶6, Spratte Affidavit).

60. Martin thereafter called her supervisor, Darla Spratte, to report what had occurred. (DEF APP p. 11 - Martin 23:1-16); (DEF APP p. 94 - ¶6, Spratte Affidavit).

9

## Jennifer Wernimont's Testimony regarding Friday, April 9, 2010

61. Wernimont worked the morning of Friday, April 9, with Jenkins and Schornhorst. (DEF APP pp. 43-44 - Wernimont 8:3-9:5).

62. It was very busy that morning, and Wernimont described Schornhorst as frustrated due to the workload and a desire to remain timely in the provision of patient services. (DEF APP pp. 43-44 - Wernimont 8:3-9:5).

63. Wernimont reported that she would get frustrated as well due to the patient load and the desire to provide timely services (DEF APP p. 45 - Wernimont 11:3-10).

64. Wernimont further testified that at no time did Schornhorst question the validity of the work restrictions on Jenkins or express any frustration about the work restrictions placed on Jenkins, but both Schornhorst and Wernimont would be frustrated on occasion by the slowness of Jenkins in the registration of patients seeking the care of MedLabs. (DEF APP pp. 46-47 - Wernimont 16:3-13; 18:8-11).

65. Wernimont further testified that the work environment at the Marion lab was no different than other place having a high workload where she had worked, and that the work environment at MedLabs' Marion Laboratory was acceptable and conducive to quality, professional work. (DEF APP p. 52 - Wernimont 36:3-24); (DEF APP p. 53 - Wernimont 45:4-14).

## Jenkins Leaves the Workplace on April 9th to have a Conversation Regarding her Coworkers' Behavior

66. Immediately after the incident with Schornhorst, Jenkins left the Marion laboratory and drove to MedLabs main offices in downtown Cedar Rapids where the management personnel are located. (DEF APP pp. 73-74 -Jenkins 111:25-114:1).

67. Jenkins admits that instead of leaving the Marion facility, she could have gone outside or sat in her car and used her cell phone to talk to human resources. (DEF APP p. 74 - Jenkins 114:8-11).

68. When Jenkins arrived at the Cedar Rapids facility, she asked her supervisor Paterson whether they could meet with Pat Goehring, who was the lab manager for MedLabs. (DEF APP p. 75 - Jenkins 116:18-117:6); (DEF APP p. 57 - Goehring 4:19-20).

69. Paterson agreed to meet with Jenkins and Goehring. (DEF APP p. 75 - Jenkins 116:18-117:6).

70. Jenkins told Goehring and Paterson that she was upset at the way in which she was being treated by Schornhorst and Martin. (DEF APP p. 75 - Jenkins 117:10-119:4).

71. When asked what Jenkins wanted done about the situation, she only replied that she wanted Goehring and Paterson to "go and get their side of the story". (DEF APP p. 75 - Jenkins 118:5-20).

72. During the meeting, Goehring was very serious with Jenkins when telling her that she was upset that Jenkins would just walk away from her patient care duties, and that such action was not to be done (DEF APP p. 78 - Paterson 43:14-25).

73. Because Jenkins appeared upset, Goehring asked Jenkins whether she would like to go home for the rest of the day; and Jenkins indicated that she would. (DEF APP p. 75 - Jenkins 117:10-119:4).

74. Jenkins admits that the suggestion of her leaving for the remainder of the day was reasonable. (DEF APP p. 75 - Jenkins 117:10-119:4).

### Management Planning of What To Do

75. Shortly after Jenkins left to go home, Goehring met with Darla Spratte, the supervisor of Schornhorst and Martin. (DEF APP pp. 94-95 - ¶¶9-11, Spratte Affidavit).

76. Goehring discussed with Spratte the fact that Jenkins had left the job without notice, and both Spratte and Goehring agreed that this was unprofessional and could compromise patient care (DEF APP p. 95 - ¶10(d), Spratte Affidavit).

77. In this discussion, the use of the Employee Assistance Program was reviewed, and it was clearly understood by Spratte that this program would be retained to counsel with all three individuals (Jenkins, Schornhorst, and Martin) in an effort to resolve any disputes and return things to normal at the Marion laboratory (DEF APP pp. 94-95 - ¶¶9-11, Spratte Affidavit).

### Monday, April 12, 2010

78. Jenkins returned to work on Monday, April 12, 2010. (DEF APP pp. 75-76 - Jenkins 119:25-120:1).

12

79. Jenkins worked with Schornhorst and Martin without incident on April 12. (DEF APP p. 76 - Jenkins 121:3-8).

80. Jenkins describes the work environment on April 12 as very busy and very quiet. (DEF APP p. 76 - Jenkins 120:18-21).

### The Meeting on Tuesday, April 13, 2010

81. On the afternoon of Tuesday, April 13, Goehring arrived at the Marion lab. (DEF APP p. 76 - Jenkins 121:13-20).

82. Goehring informed Jenkins, Schornhorst and Martin that she wanted to speak with them about the events on the previous Friday. (DEF APP p. 76 - Jenkins 121:21-122:20).

83. Goehring handed Jenkins, Schornhorst and Martin an excerpt from the employee handbook and stated that she expected all three of them to read it detail after she left. (DEF APP p. 76 - Jenkins 121:21-122:20).

84. Goehring informed Jenkins, Schornhorst and Martin that while they did not need to be friends, they needed to work together professionally to maintain a professional environment for the patients and that they needed to respect one another and communicate in a professional manner. (DEF APP p. 76 - Jenkins 121:21-123:16).

85. Jenkins, Schornhorst and Martin all agreed to work together professionally. (DEF APP p. 76 - Jenkins 123:17-23).

86. Jenkins admits that it was appropriate for Goehring to talk to three of them regarding collegiality and professionalism. (DEF APP p. 77 - Jenkins 125:17-22).

13

87. Goehring also told all three individuals (Jenkins, Schornhorst and Martin) that a part of the resolution of the matter was that all three would need to participate with the counselor from the Employee Assistance Program ("EAP") in order to continue their employment with MedLabs. (DEF APP pp. 12-14 - Martin 28:19-30:15); (DEF APP pp. 27-31- Schornhorst 31:17-35:6).

### Jenkins Refuses to Participate in EAP

88. After Goehring spoke with the three individuals (Jenkins, Schornhorst and Martin), Jenkins appeared upset, and Goehring asked to speak with her alone. (DEF APP p. 15 - Martin 31:12-19).

89. Goehring and Jenkins went outside of the laboratory to speak further. (DEF APP p. 77 - Jenkins 127:15-25).

90. Jenkins alleges that Goehring told her that she was furious that she had left the workplace on Friday, that she was concerned about Jenkins' weight loss, that she believed Jenkins was being overmedicated and was overly sensitive, and that Jenkins needed to go to counseling to work on inter-personnel relationships. (DEF APP p. 78 - Jenkins 128:1-10).

91. Jenkins admits that Goehring was unaware in April 2010 that Jenkins had been doctoring for weight loss and that Goehring was unaware in April 2010 that Jenkins had previously been diagnosed with an anxiety condition and suffering from depression. (DEF APP p. 78 - Jenkins 129:4-20).

92. Jenkins informed Goehring that she refused to participate in EAP. (DEF APP p. 78 - Jenkins 129:21-130:7).

14

93. Goehring informed Jenkins that if she refused to participate in EAP, her employment with MedLabs would cease. (DEF APP p. 78 - Jenkins 130:8-12); (DEF APP p. 87 - Jenkins 168:25-169:6).

94. Jenkins testified that when she adamantly refused to participate with the counselor in EAP, she was told that she would no longer have a position at MedLabs. (DEF APP p. 87 - Jenkins 170:2-20).

95. Jenkins acknowledged that she was given further time to consider her decision not to participate in EAO, but maintained her refusal with the understanding that she would no longer work at MedLabs (DEF APP p. 79 - Jenkins 133:12-134:6).

### Schornhorst and Martin Participate in EAP

96. After the termination of Jenkins' employment, Schornhorst and Martin participated in EAP. (DEF APP p. 79 - Jenkins 135:12-20); (DEF APP pp. 30-31 – Schornhorst 34:13-35:3).

97. According to Jenkins, it was not unreasonable for MedLabs to require Schornhorst and Martin to participate in EAP, but the requirement of participation in EAP should have only been directed to Schornhorst and Martin, and not to her. (DEF APP p. 79 - Jenkins 135:12-20); (DEF APP p. 86 - Jenkins 166:2-167:14).

### Jenkins' Current Employment

98. Jenkins is currently employed by Mercy Medical Center in Cedar Rapids. (DEF APP p. 63 - Jenkins 17:17-25).

99. She works as a Pharmacy Technician Specialist and a Certified Pharmacy Technician. (DEF APP p. 63 - Jenkins 18:1-14).

100. For some of her work, she sits at a closed vented hood. Otherwise, she alternates between sitting and standing. (DEF APP p. 65 - Jenkins 26:21-27:16).

Date: March 19, 2012

/s/ Glenn Johnson
_____
GLENN JOHNSON (AT0003856)
NYEMASTER GOODE, PC
625 First Street SE, Suite 400
Cedar Rapids, IA 52401
Telephone: 319.286.7000
Facsimile: 319.286.7050
Email: gjohnson@nyemaster.com

ATTORNEY FOR DEFENDANT
MEDICAL LABORATORIES OF EASTERN
IOWA, INC.

Copy to:

Matt J. Reilly
EELLS & TRONVOLD LAW OFFICES, P.L.C.
1921 51st Street NE
Cedar Rapids, IA 52402

ATTORNEY FOR PLAINTIFF

> **CERTIFICATE OF SERVICE**
>
> The undersigned hereby certifies that a copy of this document was served upon counsel of record for each party to the action in compliance with FRCP 5 on _March 19, 2012_
>
> [x] Electronically via ECF for ECF registrants
> [ ] U.S. Mail
> [ ] Fax _____
> [ ] Fed Ex _____
> [ ] Hand Delivered _____
> [ ] other _____
>
> /s/ Glenn Johnson