# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| JENNIFER S. JENKINS<br><br>    Plaintiff,<br><br>v.<br><br>**MEDICAL LABORATORIES OF EASTERN IOWA, INC.**<br><br>    Defendant. | CIVIL CASE No. 1:11-31-LRR<br><br><br>**MEDICAL LABORATORIES OF EASTERN IOWA, INC.'S APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendant, Medical Laboratories of Eastern Iowa, Inc., ("MedLabs"), provides the

following Appendix in support of its Motion for Summary Judgment.


Date: March 19, 2012

/s/ Glenn Johnson
_____
GLENN JOHNSON (AT0003856)
NYEMASTER GOODE, PC
625 First Street SE, Suite 400
Cedar Rapids, IA 52401
Telephone:    319.286.7000
Facsimile:    319.286.7050
Email:        gjohnson@nyemaster.com

ATTORNEY FOR DEFENDANT
MEDICAL LABORATORIES OF EASTERN
IOWA, INC.

1

Copy to:

Matt J. Reilly
EELLS & TRONVOLD LAW OFFICES, P.L.C.
1921 51st Street NE
Cedar Rapids, IA 52402

ATTORNEY FOR PLAINTIFF

<table>
<tr><td>

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of this
document was served upon counsel of record for each
party to the action in compliance with FRCP 5 on
*March 19, 2012*

[ x)] Electronically via ECF for ECF registrants
[   ] U.S. Mail
[   ] Fax _____
[   ] Fed Ex _____
[   ] Hand Delivered _____
[   ] other _____

/s/ Glenn Johnson
</td></tr>
</table>

# TABLE OF CONTENTS

Excerpts of Deposition of Julie Martin.....................................................................DEF APP 1

Excerpts of Deposition of Beth Schornhorst .........................................................DEF APP 16

Excerpts of Deposition of Kristi Paterson...............................................................DEF APP 32

Excerpts of Deposition of Jennifer Wernimont.....................................................DEF APP 39

Excerpts of Deposition of Patricia Goehring.........................................................DEF APP 54

Excerpts of Deposition of Jennifer Jenkins ...........................................................DEF APP 58

March 8, 2010 work restriction................................................................................DEF APP 88

March 18, 2010 work restriction..............................................................................DEF APP 89

Affidavit of Julie Behr...............................................................................................DEF APP 90

Affidavit of Darla Spratte ........................................................................................DEF APP 93

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 3 of 99

1          UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF IOWA
2

3

JENNIFER S. JENKINS,        )
4                                    )  CIVIL CASE
                 Plaintiff,          )  NO. 1:11-31-LRR
5                                    )
                 -vs-                )
6                                    )  DEPOSITION OF
MEDICAL LABORATORIES OF    )  JULIE MARTIN
7    EASTERN IOWA, INC.,            )
                                     )    COPY
8                Defendant.          )
                                     )
9    ------------------------)

10
         DEPOSITION OF JULIE MARTIN, taken at
11   625 First Street, S.E., Suite 400,
     Cedar Rapids, Iowa, commencing at 2:18 p.m.,
12   January 17, 2012, before Michele L. Proesch,
     Certified Shorthand Reporter of the State of
13   Iowa.

14                    APPEARANCES

15   MATT J. REILLY, of the Eells & Tronvold Law
     Offices, P.L.C., 1921 - 51st Street, N.E.,
16   Cedar Rapids, IA  52402, appeared on behalf
     of the Plaintiff.
17

18   GLENN JOHNSON, of the firm of Nyemaster,
     Goode, West, Hansell & O'Brien, PC,
19   625 First Street, S.E., Suite 400,
     Cedar Rapids, IA  52401, appeared on behalf
20   of the Defendant.

21   Also present:  Jennifer S. Jenkins
                    Julie Behr
22

23         Michele L. Proesch, CSR, RPR
            Eastern Iowa Reporting
24               P.O. Box 141
              Lowden, IA  52255
25             1-800-392-3020

DIRECT EXAM OF MARTIN BY PLAINTIFF'S COUNSEL REILLY

2

1                          INDEX

2    Witness              Attorney          Page

3    Julie Martin         Mr. Reilly          2

4

5

6

7

8

9

10

11

12                      PROCEEDINGS

13                      JULIE MARTIN,

14    witness herein, called as a witness by the

15    Plaintiff, after having been first duly

16    sworn, was examined and testified as

17    follows:

18                      EXAMINATION

19    BY MR. REILLY:

20    Q.   Can I have your full name for the record,

21         please?

22    A.   Julie Michelle Martin.

23    Q.   And your date of birth?

24    A.   ███████████████████

25    Q.   And where are you currently employed?

DEF APP 000002

| | | |
|---|---|---|
| 1 | Q. | How much time before April 13th, 2010, would |
| 2 | | it have been, if that helps? Can you give a |
| 3 | | time frame, like how long you had been |
| 4 | | there? |
| 5 | A. | I would estimate maybe six months. |
| 6 | Q. | Okay; so maybe the fourth quarter or so of |
| 7 | | 2009 you would have started? |
| 8 | A. | Uh-huh. |
| 9 | | THE REPORTER: Your answer? |
| 10 | A. | Yes, please -- Yes. Sorry. |
| 11 | Q. | And you would have started at the Marion |
| 12 | | MedLabs? |
| 13 | A. | Yes. |
| 14 | Q. | Okay; and have you been at the Marion MedLabs |
| 15 | | since '09? |
| 16 | A. | Yes, I have. |
| 17 | Q. | Okay. What's currently your schedule? |
| 18 | A. | I work as a rule Monday through Friday 12:00 |
| 19 | | to 8:30 and every fifth weekend. |
| 20 | Q. | Okay; and would that have -- how long has |
| 21 | | that been your schedule? |
| 22 | A. | Since that time, since, you know, 2010 maybe. |
| 23 | Q. | Okay; so specifically in the spring, you |
| 24 | | know, maybe February, March, April of 2010 |
| 25 | | would that have been your hours? |

```
 1          MR. JOHNSON:  Same objection.  Go ahead
 2          and answer.
 3    A.    It -- It made it sort of stressful, but no
 4          more than any other job.  Sometimes people
 5          just don't always get along.
 6          BY MR. REILLY:
 7    Q.    That's kind of what I was -- I mean, in other
 8          work settings had you seen similar
 9          interactions with people?
10    A.    Absolutely.
11    Q.    It was nothing -- Would you say it's nothing
12          out of the ordinary from what you've seen at
13          other workplaces?
14    A.    Yeah; yes, I would.  I would say that's right
15          on target.
16    Q.    And would you agree that although maybe Beth
17          and Jennifer would occasionally have some
18          conflict, they were both able to effectively
19          do their job?
20    A.    Yes, I would.
21    Q.    Okay.  Now, going to April 9th of 2010, you
22          would have been working -- where do I have
23          this -- you worked -- you came in at noon
24          that day?
25    A.    Yes, I did.
```

1           got back from lunch?

2    A.     Not that I recall.

3    Q.     Okay.  Beth didn't say that she had had a --

4           there had been a rough morning or that her

5           and Jennifer didn't get along, or do you

6           recall anything along those lines?

7    A.     I feel like she said that it had been a rough

8           morning, and she seemed annoyed.

9    Q.     Okay.  Did she get in any more specifics than

10          that?

11   A.     No.

12   Q.     So Jennifer -- Do you know about what time

13          Jennifer would have returned from lunch?

14   A.     Not exactly; between 12:00 and 1:00.

15   Q.     Okay.  I mean, it's fair to say I guess at

16          some point some drama occurred after she

17          returned from lunch.  Is that fair?

18   A.     Yes.

19   Q.     Did it happen immediately?

20   A.     No.

21   Q.     Okay.  What -- Kind of what happened after

22          she got back?

23   A.     I was reading a book.  It was really quiet

24          that afternoon.  I was reading a book.  Beth

25          was looking at the internet on one of our

1     computers, and Jenny sat down and I think

2     she was reading a magazine.

3  Q.  Okay; so it was quiet patient-wise --

4  A.  Yes, it was.

5  Q.  -- at that time?  And would there have been

6     anything inappropriate with reading a book,

7     reading a magazine, or being on a computer

8     if there is no customers --

9  A.  No.

10 Q.  -- or clients or patients, whatever I guess

11     they are; patients?

12 A.  No, there wouldn't.

13 Q.  Okay.  Now, how long did that last?

14 A.  I would guess five to ten minutes.

15 Q.  Okay.  I certainly don't want to know about

16     any conversations that you had with an

17     attorney, but with the exception of an

18     attorney have you had any -- talked to

19     anybody in preparation or connection with

20     today's deposition?

21 A.  No.

22 Q.  When is the last time you talked to Beth

23     about the events that day?

24 A.  We haven't really talked too much about it.

25     We were told not to, not since it occurred.

```
 1          kind of doing what you're doing for five to
 2          ten minutes, and then what -- It was five or
 3          ten minutes, right, you said?
 4     A.   Yes.
 5     Q.   And then what happened?
 6     A.   Jenny became upset, and she kind of slammed
 7          down her magazine and turned around and said
 8          something to the effect of, "What's wrong?
 9          What's going on?"
10     Q.   Okay.  Now, had something -- She became
11          upset.  Had something happened around the
12          time she became upset?
13     A.   No, we were sitting there in silence.
14     Q.   Okay; so she asked -- slams her magazine
15          down, "What's wrong?", and did you respond
16          or did Beth respond?
17     A.   I don't remember if Beth responded, but I
18          said, "Nothing, nothing's wrong."
19     Q.   Okay; and there was nothing wrong --
20     A.   Right.
21     Q.   -- at least in your mind; right?
22     A.   Right.
23     Q.   Okay.  What happened then?
24     A.   I think she went back to reading her magazine
25          for a moment.
```

```
 1    Q.   Okay.

 2    A.   And then she was like crying, and she stood

 3         back up, and she's like, "You guys can't do

 4         this to me" or something to that effect.  I

 5         don't know if this is verbatim, and was

 6         basically telling us that, you know, we were

 7         being mean to her and it wasn't fair and we

 8         couldn't treat her that way.

 9    Q.   Okay; and was there any response to that?

10    A.   We just sort of sat there and stared.  It was

11         kind of surprising, and I was like, "Calm

12         down.  There is" -- "It's fine.  There is

13         nothing going on.  It's okay" or something

14         to that effect.

15    Q.   Okay.  Did Beth say anything?

16    A.   I don't recall.  I don't think so.

17    Q.   Okay; but certainly if there had been

18         something -- I mean, Beth hinted there might

19         have been something going on in the morning.

20         Is that fair?

21    A.   Beth had said something to the effect of it

22         had been a stressful morning.

23    Q.   Okay; but you don't know what that referred

24         to?

25    A.   No.
```

1   Q.   Even to this day you don't know what that

2        referred to?

3   A.   Yes.

4   Q.   It could have just been very busy --

5   A.   Yes.

6   Q.   -- or it could have been there was drama

7        between them or anything else.  Is that

8        fair?

9   A.   It could have been anything.

10  Q.   It could have been anything, okay.  Now, so

11       then what happened?

12  A.   Jenny was yelling at us and crying and

13       shaking, and Beth said, "Don't talk to me

14       this way.  Don't" -- "You can't talk to me

15       this way", and she started to walk away, and

16       Jenny was pursuing her yelling at her.

17  Q.   What was Jenny saying?

18  A.   "You can't treat me this way."  I don't

19       remember exactly, but something to that

20       effect.

21  Q.   Okay.  Did Beth say, "In what way?", or did

22       she question it?  Did she say, "I'm not

23       treating you any way", that -- You know, did

24       she question, I guess, the premise of

25       Jennifer's statements?

1    A.   She just said -- She just kept saying, "Don't

2          talk to me this way" --

3    Q.   Okay.

4    A.   -- something like that.

5    Q.   So then what happened?

6    A.   Then after yelling at Beth and pursuing her

7          she -- Jenny went and got her purse and

8          left.

9    Q.   You say "pursuing her". You mean Beth is

10        walking away?

11    A.   Beth was backing away --

12    Q.   Okay.

13    A.   -- and Jenny was walking towards her yelling

14        at her.

15    Q.   Okay. I mean, how close did Jennifer get to

16        her?

17    A.   Maybe two feet away.

18    Q.   Okay. How long did this exchange take place?

19    A.   Maybe a minute.

20    Q.   Okay; and so Beth -- I'm sorry. Jennifer

21        then went and got her purse, and you said

22        she left?

23    A.   As I recall, yes, she did.

24    Q.   Do you know, did she log out?

25    A.   I don't remember.

```
 1   Q.   Okay; and what -- I mean, what happened then?
 2   A.   Well, Jenny leaving affected our staffing --
 3   Q.   Uh-huh.
 4   A.   -- and the way that she had become so
 5        agitated was -- it went beyond just a normal
 6        skirmish, and so we felt that it was
 7        relevant to call our management and report
 8        the absence --
 9   Q.   Okay.
10   A.   -- and the whole incident, so I called and
11        spoke with one of our supervisors, Darla
12        Spratte.
13   Q.   Darla Spratte?
14   A.   Yes.
15   Q.   Okay.  Where is she out of?
16   A.   She's based out of our main lab.
17   Q.   The main lab.  So -- And just so I understand
18        it, I mean, there is a main lab, and is that
19        in the area?  Is that in St. Luke's, or
20        where is the main lab?
21   A.   It's attached to St. Luke's in a medical
22        office plaza across the street.
23   Q.   Okay; then MedLabs has various kind of
24        satellite offices throughout the city --
25   A.   Yes, it does.
```

1   A.   Yes.

2   Q.   That's the 12th.

3   A.   (Nods head.)

4   Q.   And my understanding is that both Beth and

5       Jennifer would have worked that day as well.

6   A.   Yes.

7   Q.   Do you recall any -- Did anything happen or

8       do you recall any incidents that day?

9   A.   Nothing really.  It was just -- It just felt

10      awkward.  Nothing was really said about the

11      blow-up the preceding Friday.

12  Q.   Okay; so it was awkward, but there -- you

13      don't really recall any -- there wasn't

14      any -- no further blow-ups, was there?

15  A.   No.

16  Q.   And so you kind of just -- everybody did

17      their own thing.  Is that fair?

18  A.   Yes.

19  Q.   Okay; and then my understanding is then you

20      worked Tuesday as well?

21  A.   Yes, I did.

22  Q.   Now, at some point Pat showed up; is that --

23  A.   Yes.

24  Q.   Do you know when she showed up?

25  A.   Midafternoon at some point.

1    Q.   Okay.

2    A.   I'm not sure.

3    Q.   Prior to her showing up had there been any --

4         how would -- how had it gone?

5    A.   Like Monday awkward, but okay.

6    Q.   Okay; and obviously -- I don't want to say

7         "obviously".  Would you say that what

8         happened on the Friday was considerably

9         different than the -- what you had observed

10        between Jennifer and Beth in the past?

11   A.   Do you mean the blow-up?

12   Q.   Yes.

13   A.   Yes, it was different.

14   Q.   Okay; so what happened after Pat arrives?

15   A.   She sat us all down in the lab and took out a

16        sheet from the -- our employee manual, and

17        it talked about how we had to treat each

18        other in an appropriate way and respectful,

19        and we didn't have to be best friends, but

20        we had to be able to work together in a

21        respectful and appropriate manner.

22   Q.   Okay.  Did anybody say anything to that?

23   A.   Pat asked us if we could all agree to that,

24        and as I recall, Beth and I agreed that that

25        was okay, and Jenny appeared upset, and I

1       think she kind of said, you know, "Okay",

2       like sort of under her breath.

3   Q.  Okay.  Was anything else said at that time

4       that you recall?

5   A.  Pat mentioned that we would all -- we should

6       all be -- we needed to all go to the

7       Employee Assistance Program to sort of be

8       counseled to see if it would help us work

9       through our issues at our lab.

10  Q.  Okay.  Now, that's something she said you had

11      to do; correct?

12  A.  We were told that it would be basically

13      required.

14  Q.  Okay.  What was your response to that?

15  A.  "Okay."

16  Q.  Now, I mean, again, from your part would it

17      be fair to say it was Jennifer had an issue,

18      you didn't have an issue, did you?

19  A.  Not until she became agitated on Friday.

20  Q.  Okay.

21  A.  At that point it was just very stressful.

22  Q.  Okay; but, I mean, I guess one response to

23      that would be get Jennifer counseling, but I

24      didn't do anything wrong.  That wasn't your

25      response?

1   A.   It seemed frustrating, but I just wanted work

2        to go on at a less dramatic pace, to be

3        honest.

4   Q.   Than what had happened on Friday?

5   A.   Yes.

6   Q.   I mean, again, you didn't have a problem with

7        the drama -- there wasn't that much drama

8        before Friday.  Is that fair?

9   A.   Right.

10  Q.   But Friday was a very dramatic event?

11  A.   It was very stressful, yes.

12  Q.   Okay; so what else do you recall being said

13       at that time?

14  A.   Jenny appeared upset, and Pat said, you know,

15       "Why don't you come out here, into the

16       hallway, Jenny, and we can talk privately",

17       away from Beth and I --

18  Q.   Okay.

19  A.   -- and so they did.

20  Q.   Where in the hallway?  Talk about the

21       physical set-up of the MedLabs.

22  A.   It's kind of a -- sort of a cube, and the

23       front wall is glass, so they just stepped

24       right out in front of the glass and shut the

25       door behind them, a glass door.

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF IOWA
 2

 3

    JENNIFER S. JENKINS,          )
 4                                )  CIVIL CASE
              Plaintiff,          )  NO. 1:11-31-LRR
 5                                )
                                  )
              -vs-                )
 6                                )  DEPOSITION OF
    MEDICAL LABORATORIES OF       )  ELIZABETH
 7  EASTERN IOWA, INC.,           )  SCHORNHORST
                                  )
 8            Defendant.          )
                                  )
 9  --------------------------)
```

COPY

```
10

11          DEPOSITION OF ELIZABETH SCHORNHORST,
        taken at 625 First Street, S.E., Suite 400,
12      Cedar Rapids, Iowa, commencing at 1:00 p.m.,
        January 17, 2012, before Michele L. Proesch,
13      Certified Shorthand Reporter of the State of
        Iowa.

14                     APPEARANCES

15      MATT J. REILLY, of the Eells & Tronvold Law
        Offices, P.L.C., 1921 - 51st Street, N.E.,
16      Cedar Rapids, IA  52402, appeared on behalf
        of the Plaintiff.

17

18      GLENN JOHNSON, of the firm of Nyemaster,
        Goode, West, Hansell & O'Brien, PC,
19      625 First Street, S.E., Suite 400,
        Cedar Rapids, IA  52401, appeared on behalf
20      of the Defendant.

21
        Also present:  Jennifer S. Jenkins
22                     Julie Behr

23
                Michele L. Proesch, CSR, RPR
24                Eastern Iowa Reporting
                      P.O. Box 141
25                 Lowden, IA  52255
                    1-800-392-3020
```

1

INDEX

2

| Witness | Attorney | Page |
|---------|----------|------|
| Elizabeth Schornhorst | Mr. Reilly | 3 |

3

4

5

6

Exhibits                                           M

7

1 - Medlabs Employee Handbook,
8        October 2003                               21

9   2 - Two-page document dated 4/13/10,
         Bates stamped Medlabs-3-000032
10       and Medlabs-3-000033                        32

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEF APP 000017

```
 1                        PROCEEDINGS
 2                    ELIZABETH SCHORNHORST,
 3          witness herein, called as a witness by the
 4          Plaintiff, after having been first duly
 5          sworn, was examined and testified as
 6          follows:
 7                        EXAMINATION
 8          BY MR. REILLY:
 9     Q.   State your full name for the record, please.
10     A.   Elizabeth Susan Schornhorst.
11     Q.   Okay.  Date of birth?
12     A.   ████████████
13     Q.   Where are you currently employed?
14     A.   MedLabs.
15     Q.   And what's your position there?
16     A.   Medical assistant.
17     Q.   How long have you worked for MedLabs?
18     A.   It will be four years.
19     Q.   Four years what?  Do you know the approximate
20          month or season at least, start date?
21     A.   I started June 1st of 2007.
22     Q.   Okay; and you have been a medical assistant
23          the entire time?
24     A.   Yes.
25     Q.   And is it -- is that a 40-hour-a-week job?
```

1   A.  Yes.

2   Q.  And there are various MedLabs labs I guess

3       throughout the area.  Is there one in

4       particular that you work at or do you

5       rotate, or how does that work?

6   A.  No, right now I work in Marion.

7   Q.  Okay.  Do you work exclusively at Marion?

8   A.  Yes.

9   Q.  How long have you worked exclusively in

10      Marion?

11  A.  Three years.

12  Q.  So sometime in '08, since sometime in '08?

13  A.  October of '08.

14  Q.  Okay.  What are the hours of that --

15  A.  My hours?

16  Q.  Start with the hours of the operation for the

17      MedLabs in Marion.

18  A.  6:00 a.m. to 8:00 p.m.

19  Q.  Is that Monday through Friday or is that

20      Saturdays and Sundays?

21  A.  That's Monday through Friday; Saturday 8:00

22      until 3:00 or so; Sundays the same, 8:00

23      until 3:00 or so.

24  Q.  And what are your hours?

25  A.  6:00 a.m. to 2:30 Monday through Friday and

1      then every fifth weekend.

2   Q.   How many people -- And have those hours

3        been -- how long have you had those hours?

4   A.   Since June of 2007.

5   Q.   How many people are typically working at the

6        Marion MedLabs at a given time?

7   A.   Four.

8   Q.   Are there times where it's less or are there

9        on weekends -- like do less people work on

10       weekends?

11  A.   There is one.

12  Q.   So one person works on Saturday, one -- Okay;

13       so when you work Saturday when it's your

14       week --

15  A.   Uh-huh.

16  Q.   -- you work both Saturday and Sunday?

17  A.   Yes.

18  Q.   That way you're the only person working that

19       week?

20  A.   We have someone that works Saturday from 8:00

21       to 11:00 as well, so two on Saturday and one

22       on Sunday.

23  Q.   Okay.  Now, how many -- so up to four -- but

24       during the week from when it's open, during

25       the hours of operation is there typically

1          along with her?

2     A.   No.

3     Q.   Okay.  Did you know of others that had

4          problems getting along with Jennifer up

5          through April 8th of 2010?

6     A.   No.

7     Q.   Okay; so you never observed her having any

8          problems with getting along with her

9          coworkers before then?

10    A.   No.

11    Q.   And you never heard any coworkers tell you

12         that they had had problems with Jenny before

13         then?

14    A.   No.

15    Q.   That's correct?

16    A.   That's correct.

17    Q.   Okay.  What do you recall -- Do you recall

18         anything about any interactions you had with

19         Jennifer on April 9th of 2010?

20    A.   I remember her coming back from lunch.  It

21         was very quiet.  It was a slow afternoon.  I

22         remember her being agitated and yelling at

23         me and Julie and being aggressive and

24         backing me into a corner and then I remember

25         her leaving the office.

1    Q.   So nothing happened in the morning?

2    A.   No, nothing.

3    Q.   The morning -- I guess you -- Nothing -- You

4         didn't have any exchanges with her in the

5         morning?

6    A.   No.

7    Q.   Nothing -- So did you have any -- So you

8         didn't slam any drawers, for example, when

9         Jennifer came in that day?

10   A.   Not that I recall.

11   Q.   Okay.  That just totally came out of the

12        blue, that -- You got along perfectly in the

13        morning, then she went to lunch, then she

14        came back and she starts yelling at you and

15        Julie?

16   A.   It was a typical busy morning and then we had

17        lunch, and it was -- I would say it came out

18        of the blue, yes.

19   Q.   Okay.  Was anybody else working there that

20        day besides you, Jennifer Jenkins, and Julie

21        Martin?

22   A.   No.

23   Q.   Okay; so Jenny Wernimont wasn't working that

24        day?

25   A.   No.

1    Q.    Okay.  Do you recall Beth asking -- or I'm
2          sorry.  You're Beth.  Do you recall Jenny
3          asking after lunch whether anything was
4          wrong?
5    A.    No.
6    Q.    You don't recall that.  Or asking -- You
7          don't recall her asking what's wrong?
8    A.    No.
9    Q.    So it would be your testimony that prior --
10         up until her coming back from lunch on
11         April 9th you had never refused to speak to
12         Jennifer; is that correct?
13   A.    Yeah, that's correct.
14   Q.    There never would have been a time where she
15         would have had a work-related question that
16         you wouldn't have responded to?
17   A.    No.
18   Q.    Would there have been times that you worked
19         with both Jennifer Jenkins and Jenny
20         Wernimont?
21   A.    Yes.
22   Q.    Okay; but you don't think there -- prior to
23         lunch there would have been no tension
24         between you and Beth -- or Jenny or -- Jenny
25         or Julie?

1   A.   Not that I recall.

2   Q.   Okay.  You said that she yelled -- What was

3        it that -- specifically that Jennifer was

4        yelling?

5   A.   I don't -- I don't remember.

6   Q.   You don't know what it was about?

7   A.   It was about -- I don't -- I don't know.

8   Q.   Was it about saying that -- Did she say you

9        had done something, you or Julie had done

10       something?

11  A.   Not that I can recall.  I don't -- I don't

12       know.

13  Q.   Was it about that -- Was she questioning why

14       you weren't getting along or did she say you

15       were being mean to her or something to that

16       effect?

17  A.   No.

18  Q.   So you don't have any idea -- She was just

19       yelling.  Was she even talking to you or

20       Julie?

21  A.   We were the only two in the lab, so, yes.

22  Q.   But you don't know what it was about?

23  A.   I don't know her exact -- what exactly she

24       said.

25  Q.   And I don't care exactly what she said.

1   Generally what did -- I want to know

2   generally what she said, the general topic

3   of what she was talking about.

4   A.   "What" -- "What did I do?" or "What" -- "What

5   have I done?", something -- something like

6   that.

7   Q.   Okay; and you don't recall her saying

8   anything else?

9   A.   No.

10  Q.   Now, then you said -- you used the word

11  aggressive.  Describe what she did or said.

12  A.   Just came toward me.

13  Q.   So she walked towards you?

14  A.   Yeah.

15  Q.   Okay; and how close did she get to you?

16  A.   Maybe a foot or so.

17  Q.   Okay.  I mean, did she display a fist or a --

18  A.   She was just yelling and being loud, and it

19  made me uncomfortable.

20  Q.   Okay; and so she was yelling, being loud, and

21  she was saying, "What did I do?" and words

22  to that effect?

23  A.   Something like that, yes.

24  Q.   Okay.  Did you respond to her?

25  A.   I believe I said to back away from me.

1    Q.   Okay; and so she left that -- Well, then tell

2         me what happened.

3    A.   I stepped out of the way.  I stepped into the

4         patient area and then she -- her and Julie

5         exchanged some words.  I don't know what was

6         said and then she grabbed her stuff and

7         left.

8    Q.   Okay.  Do you know if she logged out before

9         she left?

10   A.   I don't know.

11   Q.   Do you know where she was going?

12   A.   No.

13   Q.   Okay.  What did -- What did you do at that

14        point?

15   A.   Asked -- Spoke with Julie --

16   Q.   Okay.

17   A.   -- about what had just happened.

18   Q.   And did you do anything else?

19   A.   I did not, no.

20   Q.   Do you know if Julie did anything else?

21   A.   Julie made a phone call.

22   Q.   Do you know who she called?

23   A.   I don't know exactly who she called.

24   Q.   Okay.  Now -- So in your words would you say

25        that what Jennifer had done to you -- was

1    Q.    -- to say?

2    A.    Yes.

3    Q.    Okay.  I mean, you had done -- I guess you

4          had done it more before.  If you do

5          something more, you become more proficient

6          and efficient at it.  Is that fair?

7    A.    Yeah, absolutely.

8    Q.    But, anyway, you didn't have any concerns

9          about the speed at which she was doing that?

10   A.    No, I did not.

11   Q.    And, I'm sorry, did you hear others

12         expressing concerns?

13   A.    No, I didn't hear anybody.

14   Q.    Okay; so you have no knowledge that anybody

15         else had any problems with it?

16   A.    No.

17   Q.    Okay.  Now, tell me about what happened after

18         Pat arrived.

19   A.    She brought some parts of the handbook with

20         her that she had copied and gave a copy to

21         each one of us and then talked to us about

22         getting along in the workplace and not

23         necessarily being friends but just getting

24         along while we were at work and then she

25         wanted us all to go to a counseling session

1  provided by St. Luke's of no charge and then

2  her and Jenny had some words in the hall

3  alone.

4   MR. REILLY:  Okay.  I'm going to have you

5  mark that as Exhibit 2.

6   (Exhibit Number 2 was marked for

7  identification.)

8 Q. Do you recognize Exhibit 2?

9 A. I believe that's what she had brought with

10  her.

11 Q. Okay, what Pat had brought.  And was it just

12  Pat that showed up --

13 A. Yes.

14 Q. -- that day?  Okay; and so while the three --

15  The three of you were together when she

16  mentioned counseling?

17 A. I believe so, yes.

18 Q. What was your reaction to that?

19 A. I said I would go.

20 Q. Did you think it odd that you were being

21  asked to do -- that you were asked -- being

22  asked to do counseling?

23 A. No.

24 Q. Okay.  I mean, basically is it fair to say

25  that what -- Did it appear to you that the

1        Friday before Jennifer out of the blue for

2        whatever reason lost it?  Would that be a

3        fair characterization?

4    A.  Yes.

5    Q.  And prior to that moment you had had no

6        problems, no issues with her whatsoever?

7    A.  I had not, no.

8    Q.  And there was -- And Julie hadn't had any

9        issues with her that you could tell?

10   A.  Not that I could tell.

11   Q.  Okay; and if Jennifer was upset, it wasn't

12       about anything that you had said or done;

13       right?

14            MR. JOHNSON:  Objection; calls for --

15       BY MR. REILLY:

16   Q.  Is that your understanding?

17            MR. JOHNSON:  Excuse me.  Can I finish my

18       objection, please?

19            MR. REILLY:  Sure.

20            MR. JOHNSON:  The question calls for this

21       witness to interpret the state of mind of

22       another.

23   A.  Not as far as I know.

24       BY MR. REILLY:

25   Q.  Okay; and as far as you know there would have

1       been nothing that you would have done or

2       said that would have given her any rise to

3       be upset about you; is that correct?

4    A.  Yes.

5           MR. JOHNSON:  Same objection.

6       BY MR. REILLY:

7    Q.  Okay; so you didn't think it was odd that you

8       were being asked to do counseling?

9    A.  No.

10   Q.  Okay.  Had you ever been asked by an employer

11      before to do counseling?

12   A.  No.

13   Q.  And were you being asked or were you being

14      told you had to do the counseling?

15   A.  We had to do the counseling.

16   Q.  Okay; and you had no hesitation being forced

17      to do counseling?

18   A.  No.

19   Q.  Okay.  Did you ultimately end up doing the

20      counseling?

21   A.  Yes.

22   Q.  When was it that you did it?

23   A.  I believe it was within the following couple

24      weeks.

25   Q.  Was this a one-time occurrence?

1    A.   Just once, yes.

2    Q.   Okay.  Do you know if Julie did?

3    A.   Yes.

4    Q.   Okay.  What was the reason that you were

5         being told that you needed counseling?

6    A.   To resolve the friction at work I believe.

7    Q.   And the only friction at work was when

8         Jennifer came back on April 9th --

9    A.   Yes.

10    Q.   -- and for no apparent reason started going

11         off on you and Jennifer --

12    A.   Julie.

13    Q.   -- or you and Julie.

14    A.   Uh-huh.

15    Q.   That's correct?

16    A.   Yes.

17    Q.   Now, so you went -- so the 13th is when Pat

18         came out.  You would have went you think the

19         next week?

20    A.   Within the next couple weeks, yeah.

21    Q.   Couple weeks?

22    A.   It was very soon.

23    Q.   Now, did Jennifer work again after the 13th?

24    A.   I don't believe so, no.

25    Q.   What's your understanding of why her

DEF APP 000031

1                    UNITED STATES DISTRICT COURT
2              FOR THE NORTHERN DISTRICT OF IOWA

3

4     JENNIFER S. JENKINS,        )
                                  )    CIVIL CASE
5                 Plaintiff,      )    NO. 1:11-31-LRR
                                  )
6                 -vs-            )
                                  )    DEPOSITION OF
7     MEDICAL LABORATORIES OF     )    KRISTI PATERSON
      EASTERN IOWA, INC.,         )
8                                 )
                  Defendant.      )
9                                 )
      --------------------------)

10

11          DEPOSITION OF KRISTI PATERSON, taken at
      625 First Street, S.E., Suite 400,
12    Cedar Rapids, Iowa, commencing at 2:57 p.m.,
      February 29, 2012, before Michele L.
13    Proesch, Certified Shorthand Reporter of the
      State of Iowa.

14

15

16

17

18

19

20

21

22

23            Michele L. Proesch, CSR, RPR
                  Eastern Iowa Reporting
24                     P.O. Box 141
                   Lowden, IA  52255
25                  1-800-392-3020

1                        APPEARANCES

2          MATT J. REILLY, of the Eells & Tronvold Law
           Offices, P.L.C., 1921 - 51st Street, N.E.,
3          Cedar Rapids, IA  52402, appeared on behalf
           of the Plaintiff.

4

5

6          GLENN JOHNSON, of the firm of Nyemaster,
           Goode, West, Hansell & O'Brien, PC,
7          625 First Street, S.E., Suite 400,
           Cedar Rapids, IA  52401, appeared on behalf
8          of the Defendant.

9

10
           Also present:   Jennifer S. Jenkins
11                          Julie Behr

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEF APP 000033

1                           INDEX

2        Witness              Attorney           Page

3        Kristi Paterson      Mr. Reilly            4

4                             Mr. Johnson          84

5

6

7

8

9        Deposition Exhibits                       M

10       39 - 90 Day Performance Appraisal,
              8/15/07                              4

11       40 - Medlabs Performance Appraisal
12            (Tech), 2008                         4

13       41 - Medlabs Performance Appraisal
              (Tech) 2009                          4

14

15

16

17

18

19

20

21

22

23

24

25

DEF APP 000034

```
 1                    PROCEEDINGS
 2            (Deposition Exhibit Numbers 39 through 41
 3            were marked for identification.)
 4                    KRISTI PATERSON,
 5            witness herein, called as a witness by the
 6            Plaintiff, after having been first duly
 7            sworn, was examined and testified as
 8            follows:
 9                    EXAMINATION
10            BY MR. REILLY:
11      Q.    Can I have your full name for the record,
12            please?
13      A.    Kristi Marie Paterson.  It's with a
14            K-r-i-s-t-i --
15      Q.    Okay.
16      A.    -- and one t in Paterson.
17      Q.    Okay.
18      A.    And the -- it's not a y, it's an i.
19      Q.    Okay; and where are you currently employed?
20      A.    MedLabs.
21      Q.    How long have you worked there?
22      A.    21 years.
23      Q.    Okay; and what is your current position?
24      A.    Operations manager.
25      Q.    How long have you been the operations
```

1          not being able to bend impact?

2     A.   Really not so much anything.

3     Q.   Do you know if she had any other restrictions

4          besides the bending?

5     A.   I think the restrictions were tighter at

6          first, that she wasn't able to even stand.

7          I think she was supposed to sit.

8     Q.   Okay; but do you know if -- at any point did

9          Julie complain about Jennifer's

10         restrictions?

11    A.   I don't recall.

12    Q.   Is it possible she did?

13    A.   I really -- I really don't know.

14    Q.   Okay.  Do you think you would remember that

15         had she complained?

16    A.   I think I probably would.

17    Q.   Okay.  At any point did Beth complain about

18         Julie's restrictions?

19    A.   I would say no.

20    Q.   Okay.  At any point did anybody else complain

21         about Jennifer's restrictions?

22    A.   I don't remember that anybody did.

23    Q.   Okay.  Do you remember her restrictions

24         changing in the March time period, March of

25         2010 time period?

1   A.   Yes.

2   Q.   What do you remember about that?

3   A.   That Jenny wasn't very happy to just have to

4        sit, and so she asked her doctor, and they

5        okayed her to do testing procedures that

6        involved standing.

7   Q.   Okay.  I mean, Jenny was again trying to be a

8        good team member.

9   A.   Yes.

10  Q.   Do you recall any other changes to the

11       restrictions other than that?

12  A.   No.

13  Q.   Okay; so between -- and when you met with her

14       on February 1, 2009 -- or 2010 -- That's the

15       date.  When you met with her February 1,

16       2010, did you raise any concerns whatsoever

17       with her performance?

18  A.   I don't recall that I did.

19  Q.   Okay.  If you had, do you think you would

20       recall that?

21  A.   Yes, or I probably would have written it down

22       here (indicating).

23  Q.   Okay.  You don't have any notes of that

24       meeting, do you?

25  A.   No.

1    Q.   Okay.  Did Pat ever tell you?

2    A.   No.

3    Q.   Okay.  Do you know -- Do you have -- Would

4         you have had Jennifer Jenkins' cell phone

5         number?

6    A.   I don't think so.

7    Q.   Okay; but Pat didn't tell you Jennifer

8         Jenkins was coming until she was --

9    A.   There.

10   Q.   -- there?  Okay; so what was -- what else did

11        Jenny say that you recall?

12   A.   I'm sorry, I really don't -- I don't

13        remember.

14   Q.   Okay; and did you and/or Pat have a response?

15   A.   Yeah, Pat -- Pat was very serious with her,

16        and she said that she was upset that she

17        would just walk off her job like that.

18   Q.   Was that one of the first things that Pat

19        would have said?

20   A.   Yes.

21   Q.   Okay; and what else do you recall Pat saying?

22   A.   Well, I just remember her being very serious

23        and stern about it, that this isn't -- she

24        doesn't take that lightly, that you don't

25        just walk off.

```
1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF IOWA
2

3

         JENNIFER S. JENKINS,          )
4                                      )  CIVIL CASE
                      Plaintiff,       )  NO. 1:11-31-LRR
5                                      )
                      -vs-             )
6                                      )  DEPOSITION OF
         MEDICAL LABORATORIES OF       )  JENNIFER
7        EASTERN IOWA, INC.,           )  WERNIMONT
                                       )
8                     Defendant.       )
                                       )
9        ------------------------)

10

11          DEPOSITION OF JENNIFER WERNIMONT, taken
         at 625 First Street, S.E., Suite 400,
12       Cedar Rapids, Iowa, commencing at 1:20 p.m.,
         February 27, 2012, before Michele L.
13       Proesch, Certified Shorthand Reporter of the
         State of Iowa.
14

15

16

17

18

19

20

21

22

23            Michele L. Proesch, CSR, RPR
                 Eastern Iowa Reporting
24                    P.O. Box 141
                  Lowden, IA  52255
25                  1-800-392-3020
```

DEF APP 000039

```
 1                        APPEARANCES

 2          MATT J. REILLY, of the Eells & Tronvold Law
            Offices, P.L.C., 1921 - 51st Street, N.E.,
 3          Cedar Rapids, IA  52402, appeared on behalf
            of the Plaintiff.
 4

 5

 6          GLENN JOHNSON, of the firm of Nyemaster,
            Goode, West, Hansell & O'Brien, PC,
 7          625 First Street, S.E., Suite 400,
            Cedar Rapids, IA  52401, appeared on behalf
 8          of the Defendant.

 9

10
            Also present:  Jennifer S. Jenkins
11                         Julie Behr

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2      Witness              Attorney          Page

3      Jennifer Wernimont   Mr. Reilly          3

4                           Mr. Johnson        26

5                           Mr. Reilly         38

6                           Mr. Johnson        44

7                           Mr. Reilly         47

8

9

10

11

12

13                        PROCEEDINGS

14                   JENNIFER WERNIMONT,

15      witness herein, called as a witness by the

16      Plaintiff, after having been first duly

17      sworn, was examined and testified as

18      follows:

19                      EXAMINATION

20      BY MR. REILLY:

21   Q.  Could I have your full name for the record,

22       please?

23   A.  Jennifer Lynn Wernimont.

24   Q.  Okay; and where do you currently reside?

25   A.  At --

1   Q.   Okay.  What did you do before that?

2   A.   Worked for MedLabs.

3   Q.   Okay.  How long did you work at MedLabs?

4   A.   Almost six years.

5   Q.   So about 2005-ish, from 2005 to 2011?

6   A.   2004 --

7   Q.   Okay.

8   A.   -- yep; November of 2004 till October of

9       2011.

10   Q.   Okay; and what did you do at MedLabs?

11   A.   I'm a medical assistant, so I was a

12       phlebotomist and then I did testing, like

13       kit testing.

14   Q.   Did you primarily work out of a particular

15       branch or did you --

16   A.   I floated.  I worked at a few different

17       clinics.

18   Q.   Okay; and specifically I want to talk

19       about -- I'm going to be talking about the

20       period of the first half of 2010, so

21       let's -- what would you have been doing --

22       So that's about two years ago.

23   A.   Right.

24   Q.   Do you recall what you would have been doing

25       in the first -- you know, first half --

1      and Jennifer Jenkins?

2  A.  She wouldn't say anything to us, but she

3      would just basically stock things, you know,

4      every -- That's how you could tell she was

5      in a mood or whatever.

6  Q.  Okay.  Now, in particular there was an

7      April 9th, 2010.  It was a Friday.  You

8      would have worked till noon that day?

9  A.  Correct.

10  Q.  This lawsuit -- After you left --

11  A.  Uh-huh.

12  Q.  -- there was -- some things happened and

13      Jennifer Jenkins left.

14  A.  Correct.

15  Q.  And by Tuesday she was fired.  Do you

16      generally -- Had you heard about that or

17      generally had some understanding of what

18      happened in that time period?

19  A.  I really -- I mean, after I left I really

20      don't know exactly what all happened.  I

21      just know Kristi had called me, and that

22      was -- that was all that was really said to

23      me with the whole incident.

24  Q.  But you generally kind of remember that time

25      frame?  Do you have a recollection like in

1      that --

2  A.  Well, the morning?  Yeah, yeah.

3  Q.  Okay.  Let's start with that -- what you

4      remember happening that morning.

5  A.  Okay.

6  Q.  It was Friday, April -- This would have been

7      a Friday, April 9th, 2010.

8  A.  Yeah.  I'm sure, I mean, we were busy because

9      it was a Friday.  We were normally busy on

10     Mondays and Fridays, and there was a little

11     tension I would say between all of us just

12     with the workload and everything; I mean, I

13     really don't recall like any -- I mean, I

14     don't recall anything said to anyone, but it

15     was just -- you could just tell there was

16     tension.

17 Q.  Okay.  Do you recall Beth slamming doors or

18     cabinets?

19 A.  Not particularly that morning I don't, but, I

20     mean, she did that every once in a while,

21     you know, stocking stuff and organizing.

22 Q.  Do you know why -- when she did that why she

23     did it?

24 A.  I think -- I mean, frustration I think.  She

25     was frustrated.

1    Q.    Do you know if that would have been a source

2          of frustration for Beth, Jenny's injury or

3          her work limitations?

4    A.    Not necessarily because, I mean, Beth, she

5          just had her -- she just liked things her

6          way; you know, like her certain way, so she

7          would -- she would just get frustrated from

8          time to time.

9    Q.    Now, Beth would have been the one -- prior to

10         the injury would have been the one that

11         would have primarily been doing the

12         check-ins; is that correct?

13   A.    Correct.

14   Q.    And so once Jenny took over she was doing

15         what Beth had primarily done?

16   A.    Right.

17   Q.    And was there concerns that Julie -- I'm

18         sorry, that Jenny wasn't doing it the way

19         that Beth had done it?  Was that part of her

20         concern?

21   A.    Yeah, just not like in a fast pace like Beth

22         would, I guess.

23   Q.    So Jennifer wasn't as fast paced checking

24         patients in, at least in --

25   A.    I mean, not -- I wasn't as fast as Beth

1    A.    No.

2    Q.    Okay; so you think it was Julie Martin said

3          that she heard Jennifer make those comments?

4    A.    Correct.

5    Q.    Okay.  Now, do you recall when you heard

6          that?

7    A.    No; no, I don't recall.

8    Q.    Did you ever confront Jennifer about whether

9          that was said?

10   A.    No.

11   Q.    Do you know whether or not Julie had ever

12         confronted Jennifer about whether those

13         words were said?

14   A.    No, I don't.

15   Q.    Do you know if Beth had even heard those

16         words?

17   A.    No.

18   Q.    Okay; and so you said apparently if that was

19         true, so if Jennifer actually had said

20         those --

21   A.    Right.

22   Q.    -- that could have been the reason why Beth

23         was upset at Jenny Jenkins?

24   A.    Correct.

25   Q.    Do you know of any other reason that she

1    Q.   Okay; but Beth had primarily done it; right?

2    A.   Correct.

3    Q.   And Jenny went from doing it once in a while

4        to doing it primarily; correct?

5    A.   Correct.

6    Q.   And so others -- who were the others that

7        were frustrated?

8    A.   Well, Beth 'cause that's who I -- that's

9        another person we worked with, but I also

10       have heard from like Julie, I remember, but

11       I didn't work with them 'cause I was gone by

12       then.

13    Q.   How often did you hear those concerns -- And

14       this all would have been after Jenny

15       became -- was put on restrictions, that

16       these concerns would have come up; is that

17       correct?

18    A.   Yeah, or, you know, even before; I mean, it

19       was just from time to time.  It wasn't like

20       every day.

21    Q.   But before Jenny was put on restrictions she

22       wouldn't have been -- Beth would have been

23       the one primarily checking patients in?

24    A.   Primarily, but we all -- we all kind of

25       rotated around.

1    A.   Yeah.

2    Q.   Okay; and so that would give an appearance

3         potentially of drawers being slammed when

4         they were being closed quickly?

5    A.   Right.

6    Q.   All right.  Now, from your personal

7         observations when she did have these moments

8         of frustration, she was just reacting to the

9         workload and -- that she was having to deal

10        with?

11   A.   Yeah.

12   Q.   And she was reacting to the disorganization

13        from her point of view that she had to work

14        with?

15   A.   Right.

16   Q.   And that disorganization really had to do

17        with how many patients came into the clinic

18        at a particular time?

19   A.   Yeah.

20   Q.   Now, do I understand correctly that with the

21        clinic in Marion, that it's not generally

22        scheduled patient times, but it's a walk-in

23        clinic?

24   A.   Right.

25   Q.   So you had no control over the volume of

1          people that would come in the front door?

2    A.   Correct.

3    Q.   With regard to the various work activities,

4          as I would understand it, there are three

5          general categories, one category is the

6          patient registration --

7    A.   Uh-huh.

8    Q.   -- one category is the laboratory work, and

9          one category is drawing the blood.  Would

10         that be a fair understanding?

11   A.   Right.

12   Q.   All right; so from when you were out there in

13         the mornings, would you rotate amongst those

14         three various types of work?

15   A.   Yeah, every once in a while we would.

16   Q.   All right; and you indicated that Beth would

17         do the primary amount of registration, but

18         she would not do it all the time; correct?

19   A.   Yeah; I mean, primarily she would do some of

20         it, but then we would rotate just to get --

21         so that we're not doing one thing all day

22         long basically.

23   Q.   Okay.  Now, were you assigned to the Marion

24         clinic roughly around the beginning of

25         January of 2010?

1    A.    Yes.

2    Q.    Were you assigned there because of the

3          workload --

4    A.    Right.

5    Q.    -- that they were carrying?

6    A.    Yes.

7    Q.    And in the mornings you would have a lot of

8          walk-in trade?

9    A.    Yes.

10   Q.    When you started working at the Marion

11         clinic, would Ms. Jenkins -- would she be

12         drawing blood and doing things other than

13         registration as well as performing

14         registration functions?

15   A.    Yes.

16   Q.    And did that change, as you recall it?

17   A.    No.

18   Q.    Okay.  Do you remember when she began to do

19         more registration type of work?

20   A.    Yes.

21   Q.    All right.  Was that roughly along the March

22         time frame, as you may recall?

23   A.    Yeah, when she had a doctor's -- Well, yeah,

24         in March.

25   Q.    Okay; and that's the doctor's note you've

1        mentioned --

2    A.  Yes.

3    Q.  -- previously?  Okay.  Did you observe any

4        change in Beth's temperament or in the way

5        she reacted to frustration or in the work

6        environment at any time from the time you

7        began on January 1 through the times that

8        you essentially left working there at Marion

9        clinic?

10   A.  No, it was the same; she was the same.

11   Q.  And when you say "she was the same", that's

12       Beth?

13   A.  Right, Beth.

14   Q.  She would react from time to time to stress?

15   A.  Right.

16   Q.  Now, Ms. Jenkins left employment in roughly

17       mid April of 2010, and you continued working

18       at the Marion clinic for a period of time,

19       did you not?

20   A.  Right.

21   Q.  And how long was that?

22   A.  I want.to say till June of 2010.

23   Q.  Okay.

24   A.  I mean, I worked there, but then that

25       schedule -- my schedule changed, like I

1        cafeteria -- or like the break room.

2    Q.   All right; so if you needed to make a

3         personal phone call, you could go to the

4         break room or could you go outside as well?

5    A.   Yeah.

6    Q.   All right.  If you had a problem at work that

7         you thought you needed to report to

8         management, would you leave work in the

9         middle of the workday to go down to the main

10        offices downtown Cedar Rapids?

11   A.   I personally wouldn't.

12   Q.   Why is that?

13   A.   Just because then you're kind of leaving your

14        other coworker hanging just in case it would

15        get busier, whatnot.

16   Q.   Could that have an impact on the patient care

17        that the patients receive at MedLabs?

18   A.   Yes.

19   Q.   Did you view your position at MedLabs to be a

20        patient care position?

21   A.   Yes.

22   Q.   Would you think that if you were to leave

23        work in the middle of your shift and

24        potentially leave patients exposed to that

25        situation, that that would reflect

```
 1         work Monday through Friday in the mornings
 2         at Marion lab?
 3    A.   Right.
 4    Q.   So there was at least one day each week that
 5         you would work with Beth where Ms. Jenkins
 6         would not be working?
 7    A.   Right.
 8    Q.   She worked four ten-hour days?
 9    A.   Right; that's correct.
10    Q.   All right.  Now, during the time that
11         Ms. Jenkins was working but was not assigned
12         for that day, so one of those days when you
13         and Beth were working without Ms. Jenkins --
14    A.   Uh-huh.
15    Q.   -- being present, would Beth occasionally
16         have a frustrating situation where she would
17         engage in that stocking activity?
18    A.   Yeah.
19    Q.   And after Ms. Jenkins was no longer employed
20         by MedLabs would Beth occasionally have a
21         day where she was frustrated and she was
22         engaged in that stocking activity?
23    A.   Yes.
24    Q.   Would her frustration on those super busy
25         moments that occurred from time to time
```

DEF APP 000053

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF IOWA
 2

 3

   JENNIFER S. JENKINS,        )
 4                             )  CIVIL CASE
              Plaintiff,       )  NO. 1:11-31-LRR
 5                             )
              -vs-             )
 6                             )  DEPOSITION OF
   MEDICAL LABORATORIES OF     )  PATRICIA L.
 7 EASTERN IOWA, INC.,         )  GOEHRING
                               )
 8            Defendant.       )
                               )
 9 ------------------------)

10

        DEPOSITION OF PATRICIA L. GOEHRING, taken
11 at 625 First Street, S.E., Suite 400,
   Cedar Rapids, Iowa, commencing at 1:05 p.m.,
12 January 18, 2012, before Michele L. Proesch,
   Certified Shorthand Reporter of the State of
13 Iowa.

14                    APPEARANCES

15 MATT J. REILLY, of the Eells & Tronvold Law
   Offices, P.L.C., 1921 - 51st Street, N.E.,
16 Cedar Rapids, IA  52402, appeared on behalf
   of the Plaintiff.
17

18 GLENN JOHNSON, of the firm of Nyemaster,
   Goode, West, Hansell & O'Brien, PC,
19 625 First Street, S.E., Suite 400,
   Cedar Rapids, IA  52401, appeared on behalf
20 of the Defendant.

21
   Also present:  Jennifer S. Jenkins
22                Julie Behr

23
              Michele L. Proesch, CSR, RPR
24              Eastern Iowa Reporting
                   P.O. Box 141
25              Lowden, IA  52255
                 1-800-392-3020
```

COPY

2

1                          <u>INDEX</u>

2       <u>Witness</u>              <u>Attorney</u>      <u>Page</u>

3       Patricia L. Goehring    Mr. Reilly      3

4                               Mr. Johnson    90

5                               Mr. Reilly     97

6                               Mr. Johnson   111

7                               Mr. Reilly    114

8

9

10
        <u>Exhibits</u>                           <u>M</u>
11
        3 - Marion Family Medicine record,
12          3/18/10                            30

13      4 - E-mail, 4/9/10                     44

14      5 - Handwritten notes, 4/13/10         64

15      6 - Employee Action/Status Form,
            4/22/10                            67
16
        7 - MedLabs document, Bates stamped
17          Medlabs-3-000034                   80

18      8 - E-mail, 4/14/10                    86

19      9 - Interrogatory No. 2 and answer     90

20

21

22

23

24

25

DEF APP 000055

1                           PROCEEDINGS
2                     PATRICIA L. GOEHRING,
3          witness herein, called as a witness by the
4          Plaintiff, after having been first duly
5          sworn, was examined and testified as
6          follows:
7                           EXAMINATION
8          BY MR. REILLY:
9     Q.   Can I have your full name for the record,
10         please?
11    A.   Patricia L. Goehring.
12    Q.   Date of birth?
13    A.   ████████████████████
14    Q.   And your current employer?
15    A.   MedLabs.
16    Q.   How long have you worked for MedLabs?
17    A.   20 years.
18    Q.   So what -- do you know the year you started?
19    A.   Well, 1991, yeah.
20    Q.   And what's your current position?
21    A.   I'm a medical technologist.
22    Q.   How long have you had that position?
23    A.   About a year now.
24    Q.   Okay; and what are your responsibilities as a
25         medical technologist?

1   A.   Well, I run instruments, draw blood, report
2        results, do maintenance, or -- That's about
3        it, I guess.
4   Q.   Okay; so a year, that would have been --
5        about when would the --
6   A.   When did I start doing that?
7   Q.   When did you start being a medical
8        technologist?
9   A.   In the beginning?
10  Q.   Well, you said this last stint -- you have
11       been a medical technologist for a year you
12       said --
13  A.   Right.
14  Q.   -- in this last stint.  When did this last
15       stint start?
16  A.   January, February-ish.
17  Q.   Of 2011?
18  A.   Correct.
19  Q.   Okay.  What were you before then?
20  A.   I was the lab manager at MedLabs.
21  Q.   Okay.  How long have you been the lab
22       manager?
23  A.   Since we opened in '91.
24  Q.   Okay.  What were your responsibilities as lab
25       manager?

DEF APP 000057

1

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF IOWA
 2

 3

           JENNIFER S. JENKINS,        )
 4                                      )  CIVIL CASE
                      Plaintiff,        )  NO. 1:11-31-LRR
 5                                      )
                      -vs-              )
 6                                      )  DEPOSITION OF
           MEDICAL LABORATORIES OF   )  JENNIFER S.
 7         EASTERN IOWA, INC.,          )  JENKINS
                                        )
 8                    Defendant.        )
                                        )
 9         -------------------------)

10

11              DEPOSITION OF JENNIFER S. JENKINS, taken
           at 1921 - 51st Street, N.E., Cedar Rapids,
           Iowa, commencing at 10:00 a.m., January 19,
12         2012, before Michele L. Proesch, Certified
           Shorthand Reporter of the State of Iowa.
13

14                        APPEARANCES

15         MATT J. REILLY, of the Eells & Tronvold Law
           Offices, P.L.C., 1921 - 51st Street, N.E.,
16         Cedar Rapids, IA  52402, appeared on behalf
           of the Plaintiff.
17

18         GLENN JOHNSON, of the firm of Nyemaster,
           Goode, West, Hansell & O'Brien, PC,
19         625 First Street, S.E., Suite 400,
           Cedar Rapids, IA  52401, appeared on behalf
20         of the Defendant.

21
           Also present:  Julie Behr
22

23              Michele L. Proesch, CSR, RPR
                   Eastern Iowa Reporting
24                      P.O. Box 141
                     Lowden, IA  52255
25                     1-800-392-3020
```

DEF APP 000058
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 61 of 99

2

```
1                           INDEX

2        Witness              Attorney      Page

3        Jennifer S. Jenkins    Mr. Johnson      4

4                               Mr. Reilly     184

5                               Mr. Johnson    188

6

7

8

9

10       Exhibits                               M

11         10 - Petition at Law and Jury Demand   4

12         11 - Notice of Claim, 4/11/10          55

13         12 - Notice of Unemployment Insurance
                 Fact-Finding Interview           55
14
           13 - Unemployment Insurance Decision   55
15
           14 - Administrative Law Judge
16               Decision                         55

17         15 - Employment Appeal Board Decision  55

18         16 - Marion Family Medicine record,
                 9/22/08
19                                                65

           16A - Marion Family Medicine record,
20               10/22/08                         65

21         17 - Marion Family Medicine record,
                 2/2/09                           65
22
           18 - Marion Family Medicine record,
23               10/14/09                         65

24         19 - PCI record, 11/9/09               65

25         20 - PCI record, 11/9/09               65
```

DEF APP 000059
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 62 of 99

**4**

1    PROCEEDINGS
2    (Exhibit Number 10 was marked for
3    identification.)
4        JENNIFER S. JENKINS
5    witness herein, called as a witness by the
6    Defendant, after having been first duly
7    sworn, was examined and testified as
8    follows:
9        EXAMINATION
10   BY MR. JOHNSON:
11 Q. Would you please state your name for the
12   record?
13 A. Jennifer Sue Len- -- sorry, Jennifer Sue
14   Jenkins.
15 Q. Ms. Jenkins, my name is Glenn Johnson. I
16   represent MedLabs in this case. You
17   understand that, do you not?
18 A. Yes, I do.
19 Q. You understand that the purpose of the
20   deposition today is for me to learn from you
21   all information that you have that may be of
22   relevance to the claims that you're making
23   in this litigation?
24 A. Yes.
25 Q. All right. In conjunction with this

**5**

1    litigation I've placed before you
2    Exhibit 10. Do you see that?
3 A. Yes, I do.
4 Q. Do you recognize what that is?
5 A. Yes.
6 Q. What is it?
7 A. It is the petition for -- from the Iowa
8    District Court for the lawsuit, I believe.
9 Q. Okay. That's the petition that you had
10   filed?
11 A. Yes.
12 Q. Did you review that petition prior to its
13   being filed with the Court?
14 A. Yes, I did.
15 Q. Was this petition drafted in any part by you?
16 A. I answered questions.
17 Q. Okay; but I mean actually typing it in or the
18   drafting, the actual creation of the text,
19   was that done by you?
20 A. I believe I was asked these questions and I
21   responded to them. I'm not sure if I wrote
22   them out and gave them to Matt or if I
23   typed, e-mailed them.
24 Q. Okay; as far as the actual document,
25   Exhibit 10, you didn't type that up?

**6**

1 A. No.
2 Q. Okay. In conjunction with your deposition
3    today aside from attending the depositions
4    of MedLabs' personnel the last two days what
5    have you done to prepare yourself?
6 A. I have reviewed all of my materials. I had
7    kept notes and documentation since this has
8    occurred, including Exhibit 10; any notes
9    that I had taken from the date of April 9th,
10   2010, through April 13th, 2010. I have
11   reviewed the unemployment hearing documents
12   and, let's see, the answers to my inter- --
13   interrogatory questions. I believe
14   that's -- I believe that's all of it.
15 Q. Did you take any notes or make any notes
16   prior to April 9 of 2010?
17 A. No.
18 Q. You indicated you made notes from the time
19   period beginning April 9, 2010, onward?
20 A. Correct.
21 Q. All right; and you were doing this on your
22   own?
23 A. Yes.
24 Q. What was the purpose for your making these
25   notes?

**7**

1 A. To document everything that happened in case,
2    you know, I would have to recall upon them.
3    You know, it's been two years, so --
4 Q. How many --
5 A. -- keep them fresh.
6 Q. I'm sorry, I didn't mean to interrupt you.
7    Have you finished your answer?
8 A. Yes, I have.
9 Q. Okay. How many pages of notes have you
10   created?
11 A. Well, I have a notebook that's probably --
12   probably has four or five pages in it,
13   including unemployment -- when I was
14   searching for jobs, includes all of that
15   information as well.
16 Q. Now, Ms. Jenkins, my memory is that those
17   notes were not produced in conjunction with
18   this litigation to date. Are you aware of
19   that?
20 A. Yes, from -- I used those notes to answer
21   questions for like the interrogatories,
22   when -- and when visiting with Matt.
23 Q. Did you review those notes in conjunction
24   with preparation for your deposition today?
25 A. Earlier in the week, yes, I did.

DEF APP 000060

**8**

1      MR. JOHNSON: Counsel, at this time I'd
2   like to request a copy of those notes be
3   produced.
4      MR. REILLY: Okay.
5      MR. JOHNSON: And I'd like to use them
6   during the course of the deposition today.
7      MR. REILLY: Do you have them?
8      THE WITNESS: I do not have my notebook
9   with me, no. I have everything that I have
10   filed -- I have copies of -- I have a file
11   in my car, but I don't have -- I don't have
12   the notebook.
13      MR. JOHNSON: Okay. Well, then for
14   purposes of the notebook and the notes we're
15   going to want to keep the record open once
16   we get those and then see if we have any
17   further questions with regard to those
18   particular documents.
19 Q.   Ms. Jenkins, aside from the notes have you
20    prepared any other documents or collected
21    any other materials aside from materials
22    that may have been given to you by your
23    counsel that relate to this litigation which
24    have not been produced?
25      MR. REILLY: I'd object to the extent

**9**

1   it's asking for documents that were prepared
2   at the request of counsel, but go ahead and
3   answer.
4 A.   **I just have copies -- I had medical records**
5    **sent. I don't believe I have those. I had**
6    **my doctor's office send those to Matt. I**
7    **have as far as work comp different release**
8    **forms from Dr. Ford at Work Well Clinic. I**
9    **believe I have physical therapy notes, which**
10    **I think Matt also received, I had made**
11    **copies of. I think that's pretty much --**
12    **let's see, medical records, and I also have**
13    **copies of my personnel file, which I also**
14    **gave to Matt. I think that's pretty much**
15    **it.**
16    BY MR. JOHNSON:
17 Q.   It sounds to me, Ms. Jenkins, as though
18    you've given your counsel a copy of all of
19    those documents, the only exception being
20    your notebook. Is that a fair
21    understanding?
22 A.   **Yes.**
23 Q.   All right; and -- Strike that. Ms. Jenkins,
24    if you'd turn to Exhibit 10, please.
25 A.   **(Witness complied.)**

**10**

1 Q.   Paragraph 8 on page 2 references an injury to
2    your back in April of 2009. Do you see
3    that?
4 A.   **Yes, I do.**
5 Q.   Did you have back problems prior to April of
6    2009?
7 A.   **I had -- Previously to that I had some lower**
8    **back pain and leg pain, and I had actually**
9    **doctored for that and had found that I had a**
10    **mild to moderate bulging disk in my lower**
11    **back, which was not work-related. We don't**
12    **ever know where it came from.**
13 Q.   Just one of those things that happened?
14 A.   **Exactly.**
15 Q.   In April of 2009 did your back condition
16    begin to worsen?
17 A.   **April 2009, yes, it did.**
18 Q.   All right. It indicates here that you
19    alternated between sitting and standing but
20    ultimately you were restricted to work in a
21    seated position; is that correct?
22 A.   **Correct.**
23 Q.   And when were the restrictions placed upon
24    you to work in a seated position only?
25 A.   **I believe it was March 18th, 2010.**

**11**

1 Q.   Okay. Now, in conjunction with the
2    alternation between standing and sitting
3    when were those limitations imposed?
4 A.   **Standing and sitting, I believe it was**
5    **March 8th, right around there, 2010.**
6 Q.   Prior to March 8th of 2010 did MedLabs
7    provide you with a stool to use when you
8    were drawing blood from patients?
9 A.   **There was a stool there, yes --**
10 Q.   All right.
11 A.   **-- for all of us to use.**
12 Q.   Was it your understanding that you were
13    supposed to be using that when you were
14    pulling blood?
15 A.   **I used it occasionally when it was**
16    **comfortable enough to draw from the patient,**
17    **yes.**
18 Q.   Well, in conjunction with the exacerbation of
19    your back situation around April of 2009,
20    you went to the doctor, did you not?
21 A.   **I'm sorry. Repeat the -- Rephrase it.**
22 Q.   Sure. When your back started to flare up
23    again in April of 2009, you went to the
24    doctor?
25 A.   **Correct.**

**12**

1  Q.  And did the doctor recommend to you that you
2      do as much as possible in a seated position
3      while at work?
4  A.  In April '09 I had I think via e-mail or a
5      phone call -- I don't recall -- I had --
6      when I hurt it I had called Pat or Kristi or
7      both -- I cannot recall -- and had told them
8      I had injured my back, and from that point
9      on I -- an appointment was set up through
10     St. Luke's Work Well Clinic to see one of
11     their physicians.
12 Q.  And after seeing physicians on or around
13     April of 2009 was it recommended to you that
14     you do as much of your work as possible in a
15     seated position?
16 A.  I don't recall exactly. They had given me --
17     Dr. Ford I believe had wanted me to have an
18     MRI and I believe physical therapy came into
19     play also.
20 Q.  And that was over the time period from April
21     of 2009 to April of 2010?
22 A.  I believe it started all around May by the
23     time I had gotten everything, the MRI and
24     physical therapy.
25 Q.  After your back condition started to act up

**13**

1      again in April of 2009 did you find yourself
2      doing more blood draws in a seated position
3      as before that time?
4  A.  I'm sorry. Rephrase that.
5  Q.  Sure. I'm comparing the time period prior to
6      April 2009 with the time period after 2009.
7      Do you understand that?
8  A.  Correct.
9  Q.  And after your back started to act up more in
10     April of 2009 did you find yourself drawing
11     blood in a seated position with greater
12     frequency than you had done prior to April
13     of 2009?
14 A.  Prior to 2009 there was a period when my back
15     was not flaring up quite as bad, so it was
16     not bothering me, and drawing that
17     particular patient in April 2009 made it
18     flare up again, so when able to, when -- you
19     know, depending on the height of the chair
20     which you draw blood in, the size of the
21     patient, yes, I would, if it was
22     comfortable, use the chair to draw blood --
23 Q.  And my question --
24 A.  -- the stool.
25 Q.  -- is were you using the stool with greater

**14**

1      frequency after your back flared up --
2  A.  Yes.
3  Q.  -- in April of 2009.
4  A.  Yes.
5  Q.  Okay. Was there any concern or criticism or
6      complaint from the employer with regard to
7      your use of the stool in conducting those
8      phlebotomy procedures?
9  A.  No.
10 Q.  Did the employer, MedLabs, work with you and
11     were they cooperative with you once you
12     reported to them you had this back flare-up
13     in April of 2009?
14 A.  Yes.
15 Q.  And ultimately that was -- that became a
16     workers' compensation claim, did it not?
17 A.  Correct.
18 Q.  And there was a third-party administrator
19     that got involved with that claim?
20 A.  Correct.
21 Q.  And that third-party administrator was
22     responsible for scheduling or helping you
23     schedule medical appointments, attending
24     some of those medical appointments,
25     overseeing the medical appointments and your

**15**

1      physical therapy; is that correct?
2  A.  Yes.
3  Q.  Did you have some levels of frustration with
4      that third-party provider from time to time?
5  A.  Yes.
6  Q.  Did you ask your employer to help you out
7      with regard to those frustrating situations?
8  A.  Yes, I believe I did.
9  Q.  And did your employer attempt to do that?
10 A.  Yes.
11 Q.  Who at the employer was working with you in
12     an effort to quell your frustrations?
13 A.  I think I pretty much worked with Kristi
14     Paterson.
15 Q.  Was she your immediate supervisor?
16 A.  Kristi was, yes.
17 Q.  Ms. Jenkins, describe for me, if you would,
18     please, your educational background.
19 A.  I graduated from Decorah High School in 1991
20     and then I attended Hawkeye Community
21     College for medical laboratory technology
22     and received an Associate's degree in
23     medical laboratory technology in 1994.
24 Q.  Have you pursued any other educational
25     endeavors beyond the AA degree?

DEF APP 000062
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 65 of 99

16

1   A.   No, I have not.
2   Q.   Was the AA degree that you received from
3     Hawkeye Tech based upon a two-year program?
4   A.   Yes.
5   Q.   After graduating in 1994 did you use your AA
6     degree in the work that you performed?
7   A.   1994, yes, I did.
8   Q.   What did you do?
9   A.   I was working for Winneshiek County Memorial
10     Hospital in Decorah from approximately 1994
11     to 1997 and then relocated to Sarasota,
12     Florida, where because I did not have their
13     Florida license I was employed at Kantor Eye
14     Institute and then we relocated back to
15     Iowa.
16   Q.   When did you relocate back to Iowa?
17   A.   Approximately 1998.
18   Q.   Did you attempt to become certified or obtain
19     the license in Florida?
20   A.   No, I did not.
21   Q.   Do you know what was required to obtain
22     licensure in Florida?
23   A.   I believe it was additional course work in it
24     may have been you have to have -- actually
25     take their Florida state test to become

17

1     certified, if I remember correctly.
2   Q.   In any event, you chose not to follow that
3     pathway?
4   A.   Correct.
5   Q.   Did you anticipate you would be returning to
6     Iowa shortly once you moved to Florida?
7   A.   No.
8   Q.   Did you say the Sarasota area in Florida?
9   A.   Yes.
10   Q.   And when you moved from the Sarasota area,
11     where did you move to, what geographic area?
12   A.   We moved to Cedar Rapids, Iowa.
13      MR. JOHNSON: Off the record.
14      (An off-the-record discussion was held.)
15      MR. JOHNSON: Okay. Let's go back on the
16     record.
17   Q.   Ms. Jenkins, are you currently employed?
18   A.   I am.
19   Q.   By whom are you currently employed?
20   A.   I am currently employed by Mercy Medical
21     Center.
22   Q.   Is that the hospital facility --
23   A.   Yes.
24   Q.   -- in Cedar Rapids?
25   A.   Yes.

18

1   Q.   In what department are you employed?
2   A.   I am in the pharmacy.
3   Q.   In what capacity are you employed?
4   A.   I am a Pharmacy Technician Specialist, and I
5     am certified, so I'm a Certified Pharmacy
6     Technician.
7   Q.   What does a Certified Pharmacy Technician do?
8   A.   They do a number of things. Mainly I work in
9     the IV compounding room where we compound
10     IVs and total parenteral nutritions for
11     patients. We also compound narcotics,
12     dispense medications, fill AccuDose machines
13     with any medications that the floors may
14     need.
15   Q.   The AccuDose machines are linked to the
16     computerized hospital record system?
17   A.   Correct.
18   Q.   And they precisely track the dispensation of
19     narcotics and other prescription drugs when
20     they are administered?
21   A.   Correct.
22   Q.   Do you have any responsibility for either
23     auditing or working with the controlled
24     substance records of the hospital?
25   A.   No, we -- we have what we call a narc

19

1     station. We just sign out narcotics, and
2     the machine keeps track of, you know,
3     whether the correct number is in there or
4     not.
5   Q.   That's the AccuDose machine?
6   A.   That is the narc station --
7   Q.   Okay.
8   A.   -- where all of our narcotics are kept.
9   Q.   So you have to electronically sign out drugs
10     to fill the AccuDose machines?
11   A.   Correct.
12   Q.   Okay. Now, if you would, please, compare and
13     contrast what you're doing as a Certified
14     Pharmacy Technician to what you were doing
15     at MedLabs. Is there any similarity?
16   A.   We're -- We're dealing with patients' lives.
17     In regards to as far as lab testing goes
18     you're drawing the patient, you're spinning
19     down the sample, you're running the test,
20     you're reporting results, and as far as the
21     pharmacy technician goes you are responsible
22     for, you know, making sure you're pulling
23     the correct medication, getting it to the
24     pharmacist, pharmacist double checks it,
25     gets it to the AccuDose machines. As far as

DEF APP 000063

### 20

1      in the IV room we're responsible for, again,
2      pulling the correct medication, the vial,
3      the correct IV bag, making sure it's
4      compounded properly in a sterile
5      environment; again, having the pharmacy
6      check it and getting it to where it needs to
7      go on the floor.
8  Q.  With regard to the IVs do you actually
9      prepare individualized IV doses for patients
10     at the hospital?
11 A.  Yes.
12 Q.  So if the physician that ordered that the IV
13     contain certain drugs or certain other
14     minerals or whatever, you would go ahead and
15     make that specific to that physician order?
16 A.  Correct. After the pharmacist has sent
17     the -- put in what needs to be ordered,
18     after they've ordered it and put it through,
19     then it prints out and we pull whatever drug
20     needed.
21 Q.  While you were employed at MedLabs what
22     position did you hold?
23 A.  Medical Lab Technician.
24 Q.  What were your duties and responsibilities as
25     a Medical Lab Technician?

### 21

1  A.  Phlebotomy. We would spin down the samples
2      and pull off what part of the blood we
3      needed to be testing; testing blood,
4      reporting results, you know, via computer or
5      by a phone call if it was a stat to a
6      physician; ordering supplies, registering
7      patients, ordering blood tests, accessioning
8      specimens, customer service to the patients.
9  Q.  Do we understand correctly that a fair amount
10     of the work that was done at the Marion
11     laboratory for MedLabs was done for the
12     medical clinics that were in the same
13     building at Marion?
14 A.  The majority of it, yes.
15 Q.  Some of that laboratory work was work that
16     could be done within the Marion laboratory
17     itself?
18 A.  Correct.
19 Q.  And you were one of the people that could do
20     that?
21 A.  Correct.
22 Q.  That type of work would involve analyses --
23     various analyses of blood?
24 A.  Right.
25 Q.  Would it involve various analyses of urine?

### 22

1  A.  We did, yes, routine urinalysis.
2  Q.  Would there be any type of culturing that was
3      done in that lab?
4  A.  We would -- As far as the culture goes we
5      would simply plate the urine sample and then
6      that was sent down to the main laboratory to
7      be analyzed.
8  Q.  How about any type of strep analysis, was
9      that done in the lab out there?
10 A.  We did the initial strep test and then we
11     would, again, plate the swab that was left
12     over and that would go down to the main lab
13     to be analyzed.
14 Q.  So the initial strep test would give you an
15     initial result and then there was a
16     confirmatory result that was grown out down
17     at the laboratory?
18 A.  Correct.
19 Q.  What types of laboratory equipment was
20     available to and used by you at the Marion
21     lab?
22 A.  We had centrifuges to spin down the samples;
23     we had a urinalysis machine, a complete
24     blood count machine, and then several rapid
25     tests, such as strep, monos, mycoplasma, but

### 23

1      we also do KOH preps, wet mounts. I believe
2      that was it.
3  Q.  Are any of those pieces of laboratory
4      equipment pieces that you now use as a
5      Certified Pharmacy Technician?
6  A.  No.
7  Q.  Have you engaged in any efforts at Mercy
8      Hospital to try to get back into the
9      laboratory to perform lab type of work?
10 A.  I have applied internally for positions in
11     the laboratory.
12 Q.  How many openings have there been in the
13     laboratory that you've applied internally
14     for?
15 A.  Let's see, there may have been just one and
16     come to find out it was just p.r.n., help as
17     needed.
18 Q.  Does Mercy Hospital have an internal transfer
19     policy that it has amongst its personnel
20     policies?
21 A.  There is a separate application, yes, to fill
22     out.
23 Q.  And have you filled that out and is that on
24     file at the hospital?
25 A.  I believe, let's see, I've filled out several

DEF APP 000064

24

1    applications, not only for the laboratory.
2    I'm trying to think.  This one was most
3    recent.  I believe they should have it.  It
4    was either that or I also went to school
5    with someone who is in the laboratory, and
6    she had spoken to me about the position, and
7    it was just p.r.n., I believe.  It was
8    either human resources that told me that or
9    someone I know that works in the lab.
10   Q.  I guess what I'm curious about, Ms. Jenkins,
11       is did you fill out an application and is
12       that application still being held and is it
13       active with the hospital or do you have to
14       fill out a new position application every time that a
15       new position may open?
16   A.  You have to fill out an application every
17       time a new position opens, and you have to
18       have it signed by your current manager.
19   Q.  Is there some type of an electronic bulletin
20       board or other bulletin board at the
21       hospital where they post job openings?
22   A.  Just through mercycare.org.
23   Q.  And do you review that with any regularity?
24   A.  No.
25   Q.  When did you receive your position at Mercy

25

1        Hospital?
2    A.  June 21st, 2010, is when I started.
3    Q.  Were you immediately certified?
4    A.  No.
5    Q.  What did it take to become certified?
6    A.  I had 30 days to get registered to let the
7        board know that I -- I think it was the Iowa
8        Pharmacy Board know that I was going to be
9        taking my test.  I had a year to take my
10       test, and I recently -- I became certified
11       in May of 2011.
12   Q.  Were you operating as a provisionally
13       Certified Pharmacy Technician prior to that
14       time?
15   A.  Can you rephrase that?
16   Q.  Sure.  Were there any limitations on what you
17       could do as a pharmacy technician prior to
18       passing your test and receiving your
19       certification?
20   A.  No.
21   Q.  So your job duties have not changed any with
22       regard to receiving the certification?
23   A.  No, I have just had more extensive training
24       in the IV room.  That is my primary
25       location.

26

1    Q.  Tell me what you do in the IV room, what do
2        you do and how you do it.
3    A.  Come in in the morning.  We have three runs a
4        day, three IV runs.  We get that first run
5        going and get all the medications that are
6        needed for that first run up to the
7        patient's -- up to the floors.  We put --
8        any mini bags that need to be made.  We
9        restock supplies.  We make TPNs in the hood
10       room, which is a completely clean, sterile
11       environment.  I make chemos for chemo
12       patients, keeping the mix clean and sterile.
13       We have compounding IV fluids, batching
14       vancomycins, batching other antibiotics,
15       thawing antibiotics.  I think that covers
16       it.
17   Q.  From what you've described it sounds like the
18       IV room is set up very similar to or very
19       much like a laboratory?
20   A.  Correct.
21   Q.  It's got an elevated laboratory table or more
22       than one elevated laboratory table?
23   A.  They are more elevated.
24   Q.  When you say "more elevated", what do you
25       mean by that?

27

1    A.  You -- The counters are higher, and we have
2        to mix, which is where you make your -- We
3        have a chemo hood and a nonchemo hood which
4        you sit at to prepare antibiotics or
5        compound drugs.
6    Q.  Are these closed vented hoods?
7    A.  Yes.
8    Q.  Similar to a small clean room set-up?
9    A.  One of our hoods is positive pressure, one of
10       is negative pressure, and where we make our
11       TPNs is a room all in itself.  It has stools
12       and counters.
13   Q.  When you're not working at the hoods or in
14       that TPN room, are you normally standing at
15       the laboratory bench?
16   A.  Alternating standing and sitting.
17   Q.  In the course of a workday -- I should ask
18       you first are you working eight-hour days?
19   A.  Yes.
20   Q.  Five eights?
21   A.  Yes.
22   Q.  Does your -- Do your days rotate?
23   A.  They rotate.  If it's your weekend, you have
24       a day off before your weekend and a day off
25       after your weekend.

DEF APP 000065

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 68 of 99

**44**

1  A.  Well, I reported to Kristi Paterson and Pat
2      Goehring, so they were my go-to people with
3      any issues.
4  Q.  How about in conjunction with your employment
5      at Mercy Hospital, who would you consider to
6      be the most important person or the most
7      important persons that relate to your job?
8  A.  I have a supervisor above me, the technician
9      supervisor, but as far as people I would go
10     to that are very important would be the
11     director of the pharmacy and the assistant
12     director of the pharmacy.
13 Q.  Does Mercy Hospital have any remote or
14     satellite pharmacy operations?
15 A.  No.
16 Q.  So you're not required to travel outside of
17     the hospital in conjunction with your work?
18 A.  No.
19 Q.  Prior to your employment at MedLabs you were
20     employed at a laboratory in the Iowa City
21     area, were you not?
22 A.  Correct.
23 Q.  What was the name of that lab?
24 A.  LabCorp.
25 Q.  The rate of compensation that you received at

**45**

1      LabCorp was substantially more than the rate
2      of compensation that you received at
3      MedLabs; is that correct?
4  A.  Correct.
5  Q.  Were the benefits at LabCorp equal to or
6      better than the benefits available to you at
7      MedLabs?
8  A.  No.
9  Q.  They were lesser in your mind?
10 A.  Yes.
11 Q.  In what way?
12 A.  They were very expensive.
13 Q.  The health care coverage primarily?
14 A.  The health care coverage was very expensive,
15     so I believe I didn't partake in the
16     insurance, and I believe you had to be there
17     for at least one to three months before
18     insurance would kick in.
19 Q.  So there was a qualification period?
20 A.  I believe so.
21 Q.  In any event, it sounds like you used the
22     health care coverage provided by the
23     Cedar Rapids Community School District
24     during that course of employment?
25 A.  I did not.

**46**

1  Q.  You didn't?  Did you have any health care
2      coverage at all?
3  A.  No, we did not.
4  Q.  Do you remember what the cost of the health
5      care coverage would have been at LabCorp as
6      compared to the cost that you paid at
7      MedLabs?
8  A.  I do not recall.
9  Q.  Were your duties at LabCorp identical to your
10     duties at MedLabs?
11 A.  Yes, I believe so.  I worked in all of the
12     same areas, microbiology, hematology,
13     urinalysis, coagulation.  They were all the
14     same areas.
15 Q.  Was LabCorp associated with any particular
16     physician's office or group of physicians?
17 A.  No.
18 Q.  It was an independent lab?
19 A.  Yes.
20 Q.  Similar to Weland Laboratories is in
21     Cedar Rapids?
22 A.  Yes.
23 Q.  How did you learn of the potential of
24     becoming employed at MedLabs?
25 A.  I believe it was online or in the newspaper.

**47**

1  Q.  Were you actively looking for new employment
2      at that time?
3  A.  Yes, I was.  The commute was getting to me.
4  Q.  The commute from Marion down to Iowa City?
5  A.  Correct.
6  Q.  LabCorp was located where in Iowa City?
7  A.  I believe Dodge Street.
8  Q.  With whom did you interview at MedLabs, if
9      you recall?
10 A.  I interviewed with Kristi Paterson.
11 Q.  Who was the person that hired you at MedLabs,
12     if you know?
13 A.  I believe it was Kristi Paterson.
14 Q.  Ms. Paterson then was your supervisor for the
15     duration of your employment?
16 A.  Yes.
17 Q.  Did you believe Ms. Paterson to be a person
18     that you could openly communicate with?
19 A.  Yes.
20 Q.  Had you openly communicated with her from
21     time to time during the course of your
22     employment at MedLabs?
23 A.  Yes.
24 Q.  Did she appear concerned about you as a
25     person as well as an employee of MedLabs?

DEF APP 000066

48

1  A.  I believe so.
2  Q.  Do you have any reason to question that she
3      wasn't concerned about you?
4  A.  No.
5  Q.  How many times did you deal with Pat Goehring
6      during the course of your employment at
7      MedLabs?
8  A.  Not a whole lot. We may have spoken on the
9      phone a few times. When it was my rotation
10     in microbiology, my week there, I may have,
11     you know, spoken hi, how are you. I believe
12     I dealt with her a little bit as far as
13     letting her know how my progress was going
14     with my back injury and with the work comp,
15     and occasionally she may have come out to
16     the Marion lab.
17 Q.  Comparing the frequency of contact with
18     Ms. Goehring versus Ms. Paterson, with whom
19     did you have the most contact?
20 A.  Kristi.
21 Q.  Paterson?
22 A.  Correct.
23 Q.  By far?
24 A.  I would say probably, yes.
25 Q.  Did you have the vast majority of your

49

1      contact concerning your back situation and
2      your work comp situation with Ms. Paterson?
3  A.  I'm sorry. Rephrase that.
4  Q.  Sure. My understanding is that your workers'
5      compensation situation and your back injury
6      was kind of an ongoing thing for a
7      substantial period of your employment at
8      MedLabs.
9  A.  Correct.
10 Q.  And your dealing with that third-party
11     administrator for the comp was ongoing for a
12     substantial part of your employment with
13     MedLabs?
14 A.  Yes.
15 Q.  In terms of your communicating what was going
16     on, asking questions, asking for help from
17     MedLabs, would those requests have primarily
18     gone to Ms. Paterson?
19 A.  Yes, they would have.
20 Q.  Would they all have gone to Ms. Paterson?
21 A.  There may have been questions that after
22     speaking with Kristi, that maybe Kristi
23     couldn't answer, that she had to in turn
24     talk to Pat about.
25 Q.  She would make the inquiry on your behalf or

50

1      would she refer you on to Pat?
2  A.  No, she was very good about making the
3      inquiry, seeing what she could do on her
4      end.
5  Q.  So she was the go-to person?
6  A.  Correct.
7  Q.  While you were employed at MedLabs did you
8      look in the newspaper, do anything else just
9      to see what potential job opportunities
10     there might be out there for you?
11 A.  Occasionally.
12 Q.  What type of positions were you looking for?
13 A.  What I went to school for, Medical Lab
14     Technician.
15 Q.  Once you were unemployed in April of 2010
16     what did you do in conjunction with your
17     search for work?
18 A.  I was required to contact -- I forget how
19     many jobs per week, which I went far and
20     above that. I probably contacted ten people
21     per week; sent, e-mailing resumes, dropping
22     off resumes, filling out applications,
23     making phone calls to potential -- for
24     potential employment.
25 Q.  I know that you're required to submit certain

51

1      information to the Iowa Department of Job
2      Services with regard to the unemployment
3      compensation in terms of those efforts of
4      seeking new work.
5  A.  Correct.
6  Q.  They have a numerical minimum of people
7      you're supposed to contact on a weekly
8      basis; is that correct?
9  A.  Yes.
10 Q.  So when you say you went beyond what was
11     required, that's the requirement you're
12     talking about?
13 A.  Correct.
14 Q.  You've mentioned the notebook that you have
15     where you've kept personal notes, and my
16     memory is that you mentioned that in your
17     efforts at seeking a new job you made
18     certain notations in that notebook?
19 A.  Yes, I did.
20 Q.  Would you have noted in that notebook each
21     and every time you made a telephone call or
22     made a visit or submitted an application to
23     any prospective employer?
24 A.  I believe I checked off, you know, that I
25     sent it, and there may -- may be dates in

DEF APP 000067

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 70 of 99

84

1    A.    **That is what it states.**
2    Q.    All right. Well, that is what you were
3        telling your physician; isn't that correct?
4    A.    **Correct.**
5    Q.    It goes on to -- Under the plan segment of
6        the medical note it says, quote, Now she has
7        more symptoms of depression than in the
8        past. She reports that after one of her
9        children was born she was placed on Prozac
10        and she tolerated this medicine better than
11        she is tolerating the Citalopram. Did I
12        read that correctly?
13    A.    **Yes.**
14    Q.    Do you know -- Do you recall, Ms. Jenkins,
15        which child is referenced here when it says
16        after one of your children was born you were
17        placed on Prozac?
18    A.    **I don't recall. I had a bit of postpartum**
19        **depression.**
20    Q.    I'm going to hand you what we marked as
21        Exhibit 22, which is, again, from Marion
22        Family Medicine; date of service is
23        January 29, 2010, and under the subjective
24        portion of this medical report the -- it
25        states that you went to the doctor at the

85

1        end of January of 2010 to discuss your
2        weight loss and that over the past several
3        months you had lost five to six pounds;
4        correct?
5    A.    **Okay. What part are you reading? Where are**
6        **you at?**
7    Q.    The S, subjective.
8    A.    **The S, okay; yes.**
9    Q.    Okay; so you were concerned about your weight
10        loss at that point in time?
11    A.    **Correct.**
12    Q.    It goes on to state, quote, She is currently
13        being treated now for depression. Did I
14        read that sentence correctly?
15    A.    **Yes.**
16    Q.    Did the physician relate your weight loss to
17        the depression you were suffering from?
18    A.    **I don't recall.**
19    Q.    I'm going to hand you what has been marked as
20        Exhibit 23, which is from Marion Family
21        Practice; date of service is March 8, 2010,
22        and this relates to a contact of your
23        physician by MedLabs; is that correct?
24    A.    **Let me read it.**
25    Q.    Sure, and you tell me when you're ready to

86

1        talk about it.
2    A.    **Okay; Okay. I'm finished.**
3    Q.    Okay. Do you see that this relates to a call
4        from MedLabs to your doctor?
5    A.    **Yes.**
6    Q.    And the caller was Kristi?
7    A.    **Yes.**
8    Q.    Who do you understand Kristi to be?
9    A.    **Kristi Paterson.**
10    Q.    Your direct supervisor?
11    A.    **Yes.**
12    Q.    What do you understand the purpose of
13        Kristi's call to be as noted in this record?
14            MR. REILLY: Object to the extent it
15        calls for speculation, whether this witness
16        has foundation beyond this exhibit, but she
17        can answer if she has knowledge.
18    A.    **Just that she had questions about my work**
19        **release and if it was possible that I could**
20        **do standing work.**
21        BY MR. JOHNSON:
22    Q.    Okay. Would you understand that she was
23        contacting your doctor to essentially make
24        the work environment better for you and make
25        it consistent with what the doctor wished?

87

1            MR. REILLY: Object to the extent it
2        calls for speculation and guessing what
3        somebody's motives were, but you can answer
4        if you know.
5    A.    **I do not know.**
6        BY MR. JOHNSON:
7    Q.    Do you think that Exhibit 23 shows a
8        disregard by Ms. Paterson about your work
9        conditions and about you as an employee?
10    A.    **No.**
11    Q.    Do you think it shows a concern about you as
12        an employee and your work conditions?
13    A.    **I don't only think it's about me, it's about**
14        **the current staffing, how we are -- how they**
15        **were going to make this work with my current**
16        **restrictions or work release.**
17    Q.    So are you saying that you don't read this as
18        being about you or do you read it as being
19        in part about you?
20    A.    **It is about me.**
21    Q.    Does it in your mind exhibit a concern about
22        you and a care for your condition?
23    A.    **Yes.**
24    Q.    Okay. I'm handing you what we've marked as
25        Exhibit 25, which is a medical report from a

DEF APP 000068

88

| | |
|---|---|
| 1 | Dr. Hlavin, H-l-a-v-i-n. Do you see that? |
| 2 | **A.** **Yes.** |
| 3 | **Q.** It's a date of service of April 1, 2010? |
| 4 | **A.** **Yes.** |
| 5 | **Q.** All right. Why don't you take whatever time |
| 6 | you need to read this exhibit in its |
| 7 | entirety and let me know once you've |
| 8 | finished your review. |
| 9 | **A.** **(Witness complied.) Okay.** |
| 10 | **Q.** Who is Dr. Hlavin? |
| 11 | **A.** **I believe she is a -- at St. Luke's Hospital,** |
| 12 | **a neurologist -- or a neurosurgeon, excuse** |
| 13 | **me, who Dr. Bentley referred me to.** |
| 14 | **Q.** There is the statement in the last paragraph |
| 15 | that reads, quote, I do not immediately see |
| 16 | a radiographic correlate for her clinical |
| 17 | symptoms. Do you see that portion of the |
| 18 | sentence? |
| 19 | **A.** **Yes.** |
| 20 | **Q.** Do you know what that means? |
| 21 | **A.** **No. I would assume it has something to do** |
| 22 | **with radiology.** |
| 23 | MR. REILLY: Don't guess. If you don't |
| 24 | know, you don't know. |
| 25 | **A.** **I don't know.** |

89

| | |
|---|---|
| 1 | BY MR. JOHNSON: |
| 2 | **Q.** I'm going to hand you what we've marked as |
| 3 | Exhibit 26, which is a medical report from |
| 4 | Marion Family Medicine; date of service of |
| 5 | April 30th, 2010, relating to you; is that |
| 6 | correct? |
| 7 | **A.** **Yes.** |
| 8 | **Q.** And you returned it appears just as a |
| 9 | follow-up with regard to the prior |
| 10 | depressive issues that you had talked to the |
| 11 | doctor about? |
| 12 | **A.** **Yes.** |
| 13 | **Q.** It references that -- In the subjective |
| 14 | portion there is the sentence, quote, She |
| 15 | reports that since leaving the job |
| 16 | her mood is actually improving. Some of the |
| 17 | negative feedback she was receiving on a |
| 18 | daily basis at work was definitely affecting |
| 19 | the mood but the fluoxetine is also helping |
| 20 | her. Did I read that portion correctly? |
| 21 | **A.** **Yes.** |
| 22 | **Q.** All right; and the negative feedback that you |
| 23 | were receiving daily, what did you mean by |
| 24 | that? |
| 25 | **A.** **Asking my coworkers work-related questions,** |

90

| | |
|---|---|
| 1 | **getting no response; doors slamming, being** |
| 2 | **felt intimidated, lack of respect.** |
| 3 | **Q.** That negative feedback, when did that begin? |
| 4 | **A.** **Since I was placed on work restrictions by** |
| 5 | **Dr. Bentley in March. It had progressively** |
| 6 | **been getting worse.** |
| 7 | **Q.** That would have been around mid to later |
| 8 | March? |
| 9 | **A.** **I believe, yes, mid March.** |
| 10 | **Q.** If you'll look at the plan portion of this |
| 11 | report, there is reference in the second |
| 12 | line that you had a history of being, quote, |
| 13 | quite resistant to taking antidepressants; |
| 14 | is that correct? |
| 15 | **A.** **Yes.** |
| 16 | **Q.** Would you agree with that statement by your |
| 17 | physician? |
| 18 | **A.** **Yes.** |
| 19 | **Q.** There is also reference of a desire to not |
| 20 | only improve your sleep but improve your |
| 21 | appetite and to have some weight gain, have |
| 22 | you get some weight gain; is that correct? |
| 23 | **A.** **Yes.** |
| 24 | **Q.** And, in fact, the doctor advised you to |
| 25 | create a food diary so that you would be |

91

| | |
|---|---|
| 1 | aware when you might be missing meals? |
| 2 | **A.** **Correct.** |
| 3 | **Q.** Did you do that? |
| 4 | **A.** **Yes, I did for a couple days.** |
| 5 | **Q.** Did the physician's concern about your loss |
| 6 | of weight and your concern about your loss |
| 7 | of weight ever resolve itself or are you |
| 8 | still concerned about that? |
| 9 | **A.** **I am no longer concerned about it.** |
| 10 | **Q.** When did that concern cease? |
| 11 | **A.** **It ceased within a couple months of probably** |
| 12 | **midsummer of 2010, probably about May, June.** |
| 13 | **Q.** I'll hand you Exhibit 27, which is another |
| 14 | Radiology Consultation Report regarding an |
| 15 | examination of August 27, 2010; correct? |
| 16 | **A.** **Correct.** |
| 17 | **Q.** And, again, they did an MRI of your brain, so |
| 18 | a head scan and they found that it was |
| 19 | normal; correct? |
| 20 | **A.** **Correct.** |
| 21 | **Q.** I'm handing you what we marked as Exhibit 28, |
| 22 | which is a medical record from Marion Family |
| 23 | Medicine; date of service is August 24, |
| 24 | 2010; is that correct? |
| 25 | **A.** **Yes.** |

DEF APP 000069

Case 1:11-cv-00031-LRR-JSS    Document 10-3    Filed 03/19/12    Page 72 of 99

96

1    That's just for the record.
2    BY MR. JOHNSON:
3  **Q.**  I'm handing you what we marked as Exhibit 33,
4    and, again, it's Marion Family Medicine;
5    date of service November 22nd, 2010, and
6    near the bottom of the document it's got the
7    phrase, Jennifer has a long history of
8    treatments with the pain clinic. Do you see
9    that?
10  **A.**  **Yes.**
11  **Q.**  Tell me about the pain clinic. Where is that
12    located?
13  **A.**  **In Mercy Medical Center.**
14  **Q.**  Okay; and how long had you been going to the
15    pain clinic?
16  **A.**  **Prior to injuring my back in April 2009 I**
17    **believe I had been there one time prior to**
18    **that for an ESI.**
19  **Q.**  ESI being what?
20  **A.**  **Epidural steroid injection.**
21  **Q.**  Okay; and that was prior to your back
22    flare-up in April 2009?
23  **A.**  **Prior to my injury, yes.**
24  **Q.**  So you got the epidural steroid injection
25    because your back was bothering you at that

97

1    point in time prior to April of 2009?
2  **A.**  **I believe so, yes.**
3  **Q.**  Do you remember when that was?
4  **A.**  **That I had the ESI?**
5  **Q.**  Yes.
6  **A.**  **I don't recall off the top of my head, no.**
7  **Q.**  Since April of 2009 how many times have you
8    been to the pain clinic?
9  **A.**  **Since April 2009 I believe I have been there**
10    **twice.**
11  **Q.**  I'm going to hand you what we marked as
12    Exhibit 34, again, Marion Medical -- excuse
13    me, Marion Family Medicine; date of service,
14    June 1, 2011. It relates to you; is that
15    correct?
16  **A.**  **Yes.**
17  **Q.**  All right. In the subjective component it
18    reads, quote, She does feel the symptoms
19    help her generalized anxiety. She does not
20    need to use the lorazepam very frequently at
21    all any longer. She still endorses low
22    energy, low mood, low motivation. No
23    thoughts of self-harm. Do you see that?
24  **A.**  **Yes, I do.**
25  **Q.**  All right; and is that information that you

98

1    would have provided to the physician at the
2    time of your visit on June 1 of 2011?
3  **A.**  **Yes.**
4  **Q.**  How would you describe at that point in time
5    the reason you thought you had low energy,
6    low mood, low motivation?
7  **A.**  **I don't recall.**
8    MR. JOHNSON: Let's go off the record.
9    (An off-the-record discussion was held.)
10    (A recess was taken.)
11    (Exhibit Number 35 was marked for
12    identification.)
13    MR. JOHNSON: Back on the record.
14  **Q.**  Ms. Jenkins, I'm going to hand you what the
15    court reporter has marked as Exhibit 35 and
16    ask you to take a look at that and let me
17    know once your review is complete.
18  **A.**  **(Witness complied.) Okay.**
19  **Q.**  Do you recognize that to be a form that you
20    received from the Iowa Workforce Development
21    with regard to the unemployment compensation
22    payments that you received for the tax year
23    2010?
24  **A.**  **Yes.**
25  **Q.**  Total amount shown is $3,573. Do you see

99

1    that?
2  **A.**  **Yes.**
3  **Q.**  Does that seem to be correct from your
4    recollection?
5  **A.**  **Yes.**
6  **Q.**  So if the rate was $420 a week, that would be
7    approximately nine weeks?
8  **A.**  **$402 was it?**
9  **Q.**  Was it 402?
10  **A.**  **I think so; at nine weeks, yes.**
11  **Q.**  Whichever it was that's approximately
12    nine weeks' worth of payments --
13  **A.**  **Yes.**
14  **Q.**  -- give or take?
15  **A.**  **Yes.**
16  **Q.**  Okay; and that would be consistent with the
17    period of time that you were not employed;
18    correct?
19  **A.**  **Yes.**
20  **Q.**  Ms. Jenkins, let's talk about the events that
21    surrounded Friday, April 9 of 2010. Are you
22    with me with that?
23  **A.**  **Yes.**
24  **Q.**  Okay. Why don't you tell me what time you
25    reported to work and what happened when you

DEF APP 000070

100

1   got to work on that Friday.
2   A.  I reported to work at seven o'clock.
3   seven o'clock is very busy in the morning.
4   We open at 6:00. Beth was there at 6:00, I
5   believe. Punch in, jump right in, and, you
6   know, get busy registering and ordering
7   patients. I believe Beth is doing -- and I
8   think Jenny Wernimont was also there that
9   day. I'm registering and ordering patients,
10  and they are doing phlebotomy or drawing
11  blood.
12  Q.  Was there any lab work being done that
13  morning?
14  A.  I can't recall. I would think so, but I
15  can't be sure.
16  Q.  And Jenny Wernimont, do you have a present
17  memory that she was there or --
18  A.  Yes, she was there.
19  Q.  Okay. Do you remember what time she arrived?
20  A.  I believe her hours were like 7:00 to noon,
21  7:00 to 11:00 or 7:00 to noon.
22  Q.  So she would have arrived the same time you
23  did?
24  A.  Correct.
25  Q.  Did you speak with her that morning?

101

1   A.  Just, you know, good morning, how are you.
2   Q.  Do you remember having any other discussions
3   with her aside from that that morning?
4   A.  No.
5   Q.  You worked until you departed for lunch?
6   A.  Correct.
7   Q.  When did you leave for lunch?
8   A.  I can't -- I can't remember; maybe noon-ish.
9   Q.  Was Jenny Wernimont still there when you left
10  for lunch or had she departed previously?
11  A.  I believe she was already gone.
12  Q.  And approximately what time did you get back
13  from lunch on that day?
14  A.  Probably 12:30, 12:45.
15  Q.  Do you normally take 30 to 45 minutes for
16  lunch?
17  A.  Yes, 'cause we get no other breaks.
18  Q.  What, if anything, do you recall that
19  occurred the morning of Friday, April 9?
20  A.  I remember going in, punching in, saying good
21  morning, sitting down, ordering, registering
22  patients, and things were very, very tense.
23  I remember Beth slamming doors, drawers,
24  stomping her feet. Something was obviously
25  awry and something, so I just continued to

102

1   do my thing, ordering, registering patients.
2   They drew the blood, continued. I remember
3   asking her at one point -- I wasn't sure how
4   to order and register a patient -- or I knew
5   how to order and register them, but was
6   unsure about some tests that I needed to
7   order. I remember turning my head
8   (indicating) to the side. She was at the
9   computer over here (indicating) or standing
10  in the corner, and I said, you know,
11  "How" -- "Is this the way you would do it?
12  How would you do this?" And I got no
13  response, so things went on. I went to
14  lunch, came back. Things were very quiet.
15  By then Julie Martin was there. She came in
16  at noon, and at that time we weren't very
17  busy when I came back from lunch. I had
18  decided it was time to ask both of them
19  while they were still there, you know,
20  "What's wrong? What did I do? Why are you
21  guys so upset with me?"
22  Q.  And that was right when you came back from
23  lunch?
24  A.  Within a few minutes, yes.
25  Q.  Okay. Now, during the morning of Friday,

103

1   April 9 did you ask Jenny Wernimont, you
2   know, what was going on or what her -- what
3   her perception of things were for that
4   morning?
5   A.  I -- I can't recall that I ever asked her.
6   Q.  Would you say that Beth was being grumpy that
7   morning?
8   A.  I would say something was bothering her, yes.
9   Q.  It sounds like it was a high traffic morning;
10  is that correct?
11  A.  Yes.
12  Q.  Higher than normal?
13  A.  Mornings are generally quite busy out there.
14  Q.  Was this busier than the normal quite busy?
15  A.  I don't remember.
16  Q.  Were there people stacked up waiting for
17  service that you recall?
18  A.  I can't be sure, but, you know, we have
19  probably four or five chairs in there.
20  We're usually very good about getting
21  patients in and out within a few minutes.
22  There is generally not much of a wait.
23  Q.  So I'm unsure about your answer, Ms. Jenkins.
24  Do you remember that there weren't people
25  waiting or you just don't have a memory?

DEF APP 000071
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 74 of 99

104

1  A.  Meaning just in the morning?  In general?
2  Q.  In the morning, April 9.
3  A.  I can't be sure.
4  Q.  Okay.  Do you recall if there was any special
5      or unusual procedures that the lab was
6      called upon to do that morning?
7  A.  I don't recall.
8  Q.  Now, there is some reference in the
9      documents -- and, in fact, it's a statement
10     attributable to Jenny Wernimont -- something
11     to the effect that once you were told that
12     you shouldn't bend over and draw blood, that
13     you'd be doing more registrations, that you
14     said something to the effect that you can
15     sit on your butt all day long like Beth.
16     Did you make any statement along those lines
17     at any time?
18 A.  Absolutely not.
19 Q.  Do you have any idea where that came from?
20 A.  No.
21 Q.  Do you have any idea if Beth was under the
22     impression that you had made some comment to
23     that effect?
24 A.  No.
25 Q.  Did you ever talk to Jenny Wernimont about

105

1      that issue or any of the issues out in the
2      work environment at the Marion lab?
3  A.  I'm sorry.  What -- Which issue?
4  Q.  The issue about the comment, where did the
5      comment come from.
6  A.  I have no idea where the comment came from.
7      I would never say anything like that.
8  Q.  Did you ask or ever talk to Jenny Wernimont
9      about where that comment may have --
10 A.  No.
11 Q.  -- come from?  Did you have discussions with
12     Jenny Wernimont at any time about the
13     working environment at the Marion lab?
14 A.  I may have stated "Do you feel something is
15     wrong here?  Why" -- "Why is it so tense?
16     Did I do something?"
17 Q.  Okay.  You say you may have stated that.
18 A.  I can't recall.
19 Q.  Okay.  Do you remember at any time prior to
20     April 9, 2010, asking Jenny Wernimont about
21     her perception of the work environment at
22     the Marion lab?
23 A.  No.
24 Q.  Do you recall prior to April 9, 2010, asking
25     anyone about their perception of the work

106

1      environment at the Marion lab?
2  A.  Not that I can recall.
3  Q.  Have you described for me all of the actions
4      that gave you cause for concern that
5      occurred the morning of Friday, April 9?
6  A.  I believe so.
7  Q.  What occurred, if anything, when you returned
8      from lunch on Friday, April 9?
9  A.  When I came back from lunch, I was sitting at
10     the computer.  I believe I was -- We weren't
11     busy at the time.  I believe I was looking
12     at a magazine or something, and Beth was
13     over here (indicating), Julie was over here
14     (indicating), and I simply turned in my
15     chair and I said, you know, "What's going
16     on?  Why are you guys so upset with me?  You
17     act like I'm not even here.  You totally
18     avoid me.  You don't answer work-related
19     questions", and at that point I got up,
20     turned, got my purse out of the cabinet that
21     was to my left (indicating) -- or to my
22     right, and got up, and Beth was going to the
23     bathroom, and I just said, "I'm going to the
24     main lab to speak with Pat and Kristi", and
25     even before I walked out I punched out of

107

1      the time clock and I left, and that was it.
2  Q.  The questions that you asked, did they draw
3      any response from either of the two?
4  A.  Little or none; nothing, pretty much nothing
5      is the response I got.
6  Q.  No verbal response whatsoever?
7  A.  No, other than Beth telling me I was
8      extremely selfish, as she was walking to the
9      bathroom, and I proceeded to walk out after
10     I told them where I was going.
11 Q.  When this occurred, did you remain seated the
12     entire time?
13 A.  I remained seated until I -- after I got my
14     purse out, punched out of the time clock,
15     and proceeded to go around the corner out
16     the door.
17 Q.  And you proceeded directly out of the office?
18 A.  Yes, I did.
19 Q.  Did you have a raised voice for any of this
20     portion of the day?
21 A.  I don't believe I did.  I was extremely -- I
22     was crying and I was shaking 'cause I -- I
23     didn't know, you know, why I was being
24     treated this way, and when I'm upset I cry.
25     I don't believe I raised my voice.

DEF APP 000072
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 75 of 99

## 108

1   Q.  Now, you heard Beth's testimony two days ago;
2       correct?
3   A.  Yes.
4   Q.  All right; and did you hear her say that you
5       were yelling at her?
6   A.  I was not yelling.
7   Q.  Did you hear --
8   A.  Yes, I heard that.
9   Q.  Did you hear Beth testify that you directly
10      approached her and were upset at that time?
11  A.  I did hear that.
12  Q.  And did you hear her say that she was backing
13      away basically indicating to you that you
14      were getting too close for her?
15      MR. REILLY:  Object; a misstatement of
16      the record.  Whatever she said she said, and
17      we'll stipulate whatever the court record
18      says it says, but you can testify if you
19      remember that.
20      THE WITNESS:  Can you rephrase the
21      question? I'm sorry.
22      MR. JOHNSON:  Sure.
23  Q.  Did you hear Beth say that she was backing
24      away from you basically indicating that you
25      were getting too close to her?

## 109

1   A.  I did hear that.
2   Q.  All right.  Now, is it your view that Beth
3       was wrong, that you did not have your voice
4       raised, you were not yelling?
5   A.  Yes.
6   Q.  Was Beth lying when she testified to that
7       effect?
8   A.  That is how she perceived it.  I was not
9       yelling.
10  Q.  Was Beth wrong when she stated that you got
11      up out of your chair and approached her?
12  A.  Yes.
13  Q.  Was she lying when she testified to that
14      effect?
15  A.  I believe so.  As she was going around the
16      counter to the bathroom (indicating), I was
17      going around the counter to go out the door
18      (indicating), so whether she perceived that
19      as me following her, that was not the case.
20  Q.  Did you get any sense that Beth felt
21      threatened by your actions or your comments
22      at that point in time?
23  A.  No.
24  Q.  Do you remember Julie Martin's deposition of
25      two days ago?

## 110

1   A.  Yes.
2   Q.  You were present for the entire deposition?
3   A.  Yes.
4   Q.  And you heard her testify throughout the
5       course of that deposition?
6   A.  Yes.
7   Q.  All right; and do you remember her
8       testifying, quote, Jenny was yelling at us
9       and crying and shaking, and Beth said,
10      "Don't talk to me this way.  Don't" -- "You
11      can't talk to me this way", and she started
12      to walk away, and Jenny was pursuing her
13      yelling at her, close quote?  Do you
14      remember her saying that?
15  A.  I remember her saying that.
16  Q.  And do you think that Julie was correct in
17      her observations of what occurred?
18  A.  No.
19  Q.  Do you know why Julie would have testified in
20      that fashion?
21  A.  No, I don't.
22  Q.  Do you remember Beth ever saying to you that
23      you can't or that you shouldn't talk to her
24      in that fashion?
25  A.  No.

## 111

1   Q.  Do you remember you saying, "You can't treat
2       me this way"?
3   A.  No.  I said, "I did not ask for this back
4       injury", and that's -- "I didn't ask for
5       these restrictions."
6   Q.  When Julie testified, as we've just talked
7       about, is it your view that she was lying?
8   A.  In my view, yes, she did not tell the truth.
9   Q.  Why is it that Julie would not have told the
10      truth?
11      MR. REILLY:  Object; calls for
12      speculation as far as what motivates
13      somebody else, but go ahead and answer if
14      you know.
15  A.  I do not know.
16      BY MR. JOHNSON:
17  Q.  Why is it that Beth would not have told the
18      truth from your point of view?
19      MR. REILLY:  Same objection.
20  A.  I can't say.  I don't know.
21      BY MR. JOHNSON:
22  Q.  Was there anybody else present in the lab at
23      this time aside from the three of you?
24  A.  No.
25  Q.  So after you left the office you drove down

DEF APP 000073
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 76 of 99

## 112

1    to the main lab?
2  A.  Correct.
3  Q.  All right. Did you give any consideration to
4    sending an e-mail or using your cell phone
5    to call down to the office to ask them to
6    have somebody come out to deal with the
7    situation with all of you together?
8  A.  No.
9  Q.  Why is that?
10  A.  It was something that needed to be dealt with
11    right away I felt. According to the
12    employee handbook I can -- if I feel that
13    I'm in a hostile working environment, being
14    mistreated, feeling intimidated, that all
15    needs to be reported to management.
16  Q.  What's your definition of a hostile work
17    environment?
18  A.  I would say feeling like there is -- you're
19    very uncomfortable around the people that
20    you're working with and just by some of
21    their actions, like Beth slamming doors and
22    just storming around the lab.
23  Q.  Why is it that a phone call from you would
24    not have drawn a response that was
25    immediate?

## 113

1  A.  There is no privacy in the lab.
2  Q.  Couldn't you have gone out and used your cell
3    phone?
4  A.  I would have been leaving the workplace.
5  Q.  Did you leave the workplace to go to the rest
6    room?
7  A.  The rest room is located in the lab.
8  Q.  So you only used that rest room in the lab?
9    You never left the lab other than to go to
10    lunch?
11  A.  Maybe to get a specimen from the doctor's
12    office.
13  Q.  What I'm trying to understand, Ms. Jenkins,
14    is it your testimony and the reason that you
15    drove down to the main laboratory in
16    Cedar Rapids to report this incident is
17    because you were going to be leaving the
18    laboratory anyway, whether you made a phone
19    call or whether you left and drove down to
20    the main lab?
21  A.  Rephrase that.
22  Q.  Sure. Your explanation for not calling
23    down -- using your cell phone to call down
24    and talk to management was that you'd be
25    leaving the lab; am I correct?

## 114

1  A.  That is where human resources is located.
2  Q.  Your explanation for not using your cell
3    phone to call down to report your concerns
4    and for -- was because you would be leaving
5    the lab?
6  A.  Yes, I left the lab 'cause there was no
7    privacy.
8  Q.  Okay. Could you have gone outside or sat in
9    your car and used your cell phone to call
10    down and talk with management? Yes or no.
11  A.  Yes, I could have.
12  Q.  Could you then have returned to work after
13    having made that telephone call?
14  A.  No, because by then everybody was very
15    uncomfortable. No, I wouldn't have been
16    able to return back to work.
17  Q.  So your judgment was it was better for you to
18    leave the work environment?
19  A.  Yes.
20  Q.  And is that why you drove down to the main
21    lab as opposed to telephoning this concern
22    to management?
23  A.  I was following proper procedure. That is
24    why I left the lab, to go to human resources
25    to report harassment.

## 115

1  Q.  Are you aware that there is anything in the
2    employee handbook that says that if you have
3    an incident at work, you should leave the
4    work environment during working hours and
5    drive down to the main lab to report it?
6  A.  I am not aware of that, no.
7  Q.  Would it be a fair understanding,
8    Ms. Jenkins, that you were upset at that
9    point in time in the afternoon of Friday,
10    April 9?
11  A.  Yes, I was upset.
12  Q.  Were you angry?
13  A.  I wouldn't say I was angry. I would say I
14    was upset. I was crying.
15  Q.  What did Julie Martin do on December 9 to
16    make you uncomfortable?
17  A.  You mean April 9th?
18  Q.  I'm sorry, April 9.
19  A.  I felt like the two of them were in on
20    something together. They were very good
21    friends. I felt that Julie had always made
22    me feel uncomfortable. I can't exactly put
23    my finger on it, but --
24  Q.  Have you finished your answer?
25  A.  Yes.

DEF APP 000074

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 77 of 99

116

1  Q.  Okay. Are you saying, Ms. Jenkins, that you
2      had a general unease around Julie Martin?
3  A.  Yes.
4  Q.  Nothing specific?
5  A.  Actually she was very rude to patients.
6      Patients would come in, get their blood work
7      done, and she would bad-mouth them as soon
8      as they left the room. As soon as they left
9      she'd make fun of patients, so that's where
10     my uneasiness came from.
11 Q.  Did you ever report your concerns about her
12     comments of patients to management?
13 A.  No.
14 Q.  Is there anything else that Julie Martin did
15     to cause you concern or discomfort in the
16     work environment?
17 A.  No.
18 Q.  Over the weekend -- Well, strike that. You
19     went down to the main lab on Friday
20     afternoon, April 9 of 2010, and you walked
21     in, and who did you go see?
22 A.  I went to see Pat and Kristi.
23 Q.  Do they office together?
24 A.  No. We ended up in Pat's office.
25 Q.  Who did you see first?

117

1  A.  I believe I went to Kristi's office and asked
2      her if I could speak with her and Pat and
3      proceeded to go over to Pat's office.
4  Q.  Did Kristi agree that you could speak with
5      them and direct you to Pat's office?
6  A.  Yes.
7  Q.  When you got to Pat's office was the door
8      opened or closed after both of you got in?
9  A.  I don't recall.
10 Q.  What did you say when you were in Pat's
11     office and what did Kristi say and what did
12     Pat say?
13 A.  I simply went in and stated that ever since
14     I -- that I was very upset at the way I was
15     being treated by Julie and Beth, and I felt
16     like I was being ganged up on. I felt very
17     uncomfortable, and, you know, I would ask,
18     for instance, a work-related question to
19     Beth and got no response, doors slamming,
20     drawers slamming, and I felt that it was --
21     had been going on since I had been put on
22     work restrictions by Dr. Bentley in the
23     second or third week of March. Pat -- Pat
24     proceeded to tell me that she didn't agree
25     that -- she was unhappy that I had left work

118

1      to come -- to come and talk to them about
2      this. As far as Kristi goes, she more or
3      less -- I don't recall. I think she was
4      just listening.
5  Q.  Have you told me everything that you remember
6      that you said, that Pat said, and that
7      Kristi said during this meeting at the main
8      lab of MedLabs on the afternoon of Friday,
9      April 9, 2010?
10 A.  I believe so. I was -- I remember I was
11     extremely shaken by the whole situation. I
12     was crying, and I had -- I remember I
13     told -- or Pat and Kristi had asked, "Well,
14     what do you want us to do about this?" And
15     I said, "Well, I would like you to go and
16     get their side of the story", and Pat asked
17     me if I would like to go home for the day
18     to, you know, calm down, and that's what I
19     did, and she also asked me if I would be
20     returning on Monday, and I stated yes.
21 Q.  Have you now covered for me everything that
22     you remember about that meeting in Pat's
23     office?
24 A.  That is what I remember.
25 Q.  The question by Pat asking if you would like

119

1      to go home for the remainder of the day, did
2      that seem reasonable in light of the way
3      that you felt at that point in time?
4  A.  Yes.
5  Q.  Did you attribute anything to the question of
6      whether you would be returning to work on
7      Monday?
8  A.  I don't understand the question.
9  Q.  Okay. When you were asked if you'd be
10     returning to work on Monday, did you have
11     any questions or concerns about being asked
12     that question?
13     MR. REILLY: You mean at the meeting?
14     MR. JOHNSON: That's exactly what we're
15     talking about, the meeting and when she was
16     asked about whether she would return to work
17     on Monday.
18 A.  I may have thought, well, yeah, I'm going to
19     return to work. I didn't do anything.
20     BY MR. JOHNSON:
21 Q.  Did you understand that that may have been a
22     question of, you know, do you find the
23     situation such that you're going to quit?
24 A.  No.
25 Q.  Okay. You did return to work on Monday?

120

1  A.  I did.
2  Q.  Did you talk with anybody about the events at
3      the workplace over the weekend?
4  A.  No, other than I had -- I had spoken to my
5      husband.
6  Q.  Did you speak with anybody else at MedLabs
7      about the events that occurred on Friday,
8      April 9 either on that day or over the
9      weekend?
10 A.  No, I don't believe so.
11 Q.  Since that time have you spoken with anybody
12     in MedLabs about the events of Friday,
13     April 9?
14 A.  No.
15 Q.  So you went to work Monday morning as
16     scheduled?
17 A.  Yes.
18 Q.  How did the -- What was the work environment
19     like on Monday?
20 A.  As I recall, it was very busy in the morning,
21     very quiet, and that's all I can recall.
22 Q.  Okay; then on Tuesday you reported to work
23     again at 7:00 a.m.?
24 A.  Correct.
25 Q.  Was Beth already working by the time you

121

1      reported on Tuesday?
2  A.  Yes.
3  Q.  On Monday did Beth open up at 6:00 and you
4      reported at 7:00 a.m.?
5  A.  Yes.
6  Q.  And did Julie Martin arrive midday on Monday
7      to work?
8  A.  Yes, I believe so.
9  Q.  Okay; and did the same thing occur on
10     Tuesday, did Julie Martin arrive midday on
11     Tuesday to work?
12 A.  Yes.
13 Q.  Were there any events or occurrences or
14     concerns that you had about the work
15     environment on Tuesday prior to Pat's
16     arrival?
17 A.  No.
18     Pat arrived early in the afternoon on
19     Tuesday?
20 A.  Yes.
21 Q.  When Pat arrived, what do you recall as to
22     who was present in the lab?
23 A.  Julie Martin, Beth Schornhorst, and myself.
24 Q.  What happened when Pat arrived?
25 A.  She came in and said she wanted to speak with

122

1      the three of us.  She -- about the incident,
2      Friday.  She handed each of us an excerpt
3      from the employee handbook and just stated
4      that -- what her expectations were from us,
5      that, you know, we didn't have to be
6      friends, we did have to respect one another;
7      you know, we're here for the patient, and
8      that is what I recall.
9  Q.  Exhibit 2, is that a copy of what she handed
10     to all three of you?
11 A.  Yes.
12 Q.  Did she tell you when she handed out the
13     handout that she expected all of you to read
14     that in detail after she was gone?
15 A.  Yes.
16 Q.  So she was there to talk to all three of you
17     initially and then you were supposed to take
18     the handout and to study it later on; is
19     that correct?
20 A.  To read through it, yes.
21 Q.  All right.  Did she ask you and/or either of
22     the other two if you would agree to the plan
23     whereby you would diligently work toward
24     getting along with one another?
25 A.  Can you ask that again?

123

1  Q.  Uh-huh.
2  A.  I'm sorry.
3  Q.  When Pat was talking with you, you've
4      described the fact that she was pointing out
5      that it was necessary to be able to work
6      together professionally --
7  A.  Uh-huh.
8  Q.  -- correct?
9  A.  Uh-huh.
10 Q.  Is that a yes?
11 A.  Yes.
12 Q.  To maintain a professional environment?
13 A.  Yes.
14 Q.  All right.  To communicate with one another
15     in a professional manner?
16 A.  Yes.
17 Q.  Did she seek agreement from you and from the
18     other two that that was what should be done?
19 A.  Yes.
20 Q.  Was there agreement to that?
21 A.  I believe so.
22 Q.  Did you agree to that?
23 A.  Yes.
24 Q.  Now, there also was an issue that related to
25     having an outside party -- this is the

DEF APP 000076

124

1  Employee Assistance Program -- provide some
2  assistance to deal with the interpersonal
3  relationships and the working environment in
4  Marion, was there not?
5  A.  I was not aware of that until I was pulled
6  outside with Pat and she told me that I
7  needed to go to counseling, is what she
8  called it.
9  Q.  So you don't remember that being one of the
10  items that was generally discussed upon
11  Pat's initial arrival?
12  A.  No.
13  Q.  Now, when Julie Martin testified about the
14  events upon Pat's arrival out there when she
15  was talking to all three of you, do you
16  remember her testifying, quote, Pat
17  mentioned that we would all -- we should all
18  be -- we needed to all go to the Employee
19  Assistance Program to sort of be counseled
20  to see if it would help us work through our
21  issues at our lab, close quote?  Do you
22  remember her testifying to that effect?
23  A.  I remember her testifying to that.
24  Q.  All right.  Now, your memory is that that was
25  not done; is that correct?

125

1  A.  Correct.
2  Q.  All right.  Do you think that Julie is
3  incorrect in what she is testifying to?
4  A.  Yes.
5  Q.  Do you think that she was lying when she
6  testified in that fashion?
7  A.  I don't know that she was lying, but it was
8  incorrect.
9  Q.  Do you have reason to believe that your
10  memory is better than Julie Martin's?
11  A.  In this case, yes.
12  Q.  All right.  Were you upset or concerned in
13  any fashion at the time that Pat was out
14  visiting with all three of you?
15  A.  I wasn't upset until Pat pulled me outside to
16  speak with me.
17  Q.  Did you feel any sense of awkwardness when
18  Pat was out addressing all three of you
19  together about collegiality,
20  professionalism, getting along together?
21  A.  No, I would think that that's what she needed
22  to do.
23  Q.  Did you know that she was coming out on that
24  Tuesday afternoon prior to her arrival?
25  A.  No.

126

1  Q.  Do you know if either of the other two were
2  aware that she was coming out prior to the
3  time of her arrival?
4  A.  No.
5  Q.  Do you remember during Beth's deposition she
6  was asked the question, Now, tell me about
7  what happened after Pat arrived, and her
8  answer was, quote, She brought some parts of
9  the handbook with her that she had copied
10  and gave a copy to each one of us and then
11  talked to us about getting along in the
12  workplace not necessarily being friends
13  but just getting along while we were at work
14  and then she wanted us all to go to a
15  counseling session provided by St. Luke's at
16  no charge and then her and Jenny had some
17  words in the hall alone, close quote?  Do
18  you remember that testimony?
19  A.  I do.
20  Q.  Okay.  Would you understand that that is what
21  Beth remembered from the events and from the
22  discussion that occurred upon Pat's arrival
23  at the workplace on Tuesday afternoon?
24  A.  Yes.
25  Q.  All right.  You disagree with Beth's memory?

127

1  A.  Yes, I do.
2  Q.  And do you have any reason to believe that
3  your memory is superior to Beth's memory
4  with regard to this event?
5  A.  No, I -- No, just that I went home that
6  afternoon and documented everything.
7  Q.  And where did you document it?
8  A.  In my notebook.
9  Q.  So are you testifying, Ms. Jenkins, that
10  every word that was said you wrote down in
11  your notebook when you went home?
12  A.  That I could remember.
13  Q.  Okay; and what time did you go home that day?
14  A.  I believe I punched out at 1:12.
15  Q.  We have you going out into the hallway with
16  Pat on that Tuesday afternoon.  Do you know
17  why you went out in the hallway with Pat and
18  neither Beth nor Julie joined you?
19  A.  No.
20  Q.  So you don't remember why that was the case?
21  A.  No, she just asked to speak with me out in
22  the hall.
23  Q.  Okay; and did you proceed with her out to the
24  hall?
25  A.  I did.

DEF APP 000077

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 80 of 99

Jenkins vs. MedLabs                                                                    Jennifer S. Jenkins

128

1  Q.  All right. What occurred at that point in
2      time?
3  A.  **In the hallway she proceeded to tell me that**
4      **she was furious that I had left the**
5      **workplace the Friday before, also had stated**
6      **that she was concerned about my weight loss**
7      **and felt that I was being overmedicated, I**
8      **was being overly sensitive, and that I**
9      **needed to go to counseling to work on my**
10     **interpersonal relationships.**
11 Q.  Did Pat use the exact words, quote, to work
12     on your interpersonal relationships, close
13     quote?
14 A.  **Yes, she did.**
15 Q.  Did she use the phrase overmedicated?
16 A.  **Yes, she did.**
17 Q.  Did Pat use the phrase overly sensitive?
18 A.  **Yes.**
19 Q.  So those are exact quotes that you're
20     attributing to her?
21 A.  **Yes.**
22 Q.  Was there any reason for Pat to be concerned
23     about your weight loss?
24 A.  **No.**
25 Q.  Had you been concerned about your weight

129

1      loss?
2  A.  **Yes, but I had been doctoring for it, and it**
3      **was -- I attributed it to stress.**
4  Q.  Now, Pat wasn't aware that you had been
5      doctoring for your weight loss, was she?
6  A.  **No.**
7  Q.  All right. She wasn't aware that you had
8      been previously diagnosed with an anxiety
9      condition, was she?
10 A.  **No.**
11 Q.  Pat wasn't aware that you had been previously
12     diagnosed as suffering from depression, was
13     she?
14 A.  **No.**
15 Q.  In fact, none of the management people at
16     MedLabs were aware of those things, were
17     they?
18 A.  **No.**
19 Q.  You kept those to yourself?
20 A.  **Yes.**
21 Q.  Okay. Did -- Well, strike that. Have you
22     told me everything that you remember that
23     was said by Pat when you were meeting with
24     her outside of the lab in Marion?
25 A.  **I believe so. She had, again, stated she was**

130

1      **furious -- oh, furious that I left the**
2      **workplace and that had Kristi not been there**
3      **she would have fired me on Friday. She**
4      **was -- other than that I think wanted me to**
5      **go to counseling, and I refused a couple**
6      **different times, and she told me to get my**
7      **things and leave.**
8  Q.  What were her exact words when she told you
9      to get your things and leave, as you recall?
10 A.  **"If you're not willing to go to counseling,**
11     **you can get your things and leave", is what**
12     **I recall.**
13 Q.  Have you now told me, Ms. Jenkins, everything
14     that you remember about your conversation
15     with Pat outside of the lab in Marion on
16     that Tuesday?
17 A.  **As I can recall, yes.**
18 Q.  You walked back into the lab following that?
19 A.  **Yes.**
20 Q.  And you got your things and you left?
21 A.  **Yes, got my children's pictures and my purse**
22     **and I left.**
23 Q.  How long did that take to walk in, get those
24     materials, and leave?
25 A.  **One to two minutes.**

131

1  Q.  Did you speak with either Beth or Julie when
2      you came back in the lab?
3  A.  **No.**
4  Q.  Were you upset at that point in time?
5  A.  **Yes, I was crying.**
6  Q.  Were you angry at that point in time?
7  A.  **No, I was more hurt than angry.**
8  Q.  So you went home. At approximately what time
9      of the day was it?
10 A.  **Approximately 1:10, 1:15.**
11 Q.  What did you do after you left the Marion
12     lab?
13 A.  **I went directly home -- I had spoke to my**
14     **husband, first of all; went directly home**
15     **and got a notebook and started writing**
16     **everything that had occurred.**
17 Q.  When did you speak with your husband?
18 A.  **I think I tried on my way home but was not**
19     **able to get ahold of him until I got home,**
20     **so it was probably between 2:00 and 3:00 I**
21     **would imagine.**
22 Q.  So you tried to call him from your cell phone
23     as you were driving home?
24 A.  **Yes.**
25 Q.  When you were able to connect with your

DEF APP 000078

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 81 of 99

132

1　　husband -- This was telephonic; is that
2　　correct?
3　A.　Yes.
4　Q.　-- what did you say and what did he say?
5　A.　I had said that Pat had come to the lab and
6　　had told me that I needed to agree to go to
7　　counseling, and I refused a couple different
8　　times because I didn't need counseling, and
9　　she said, "Okay, get your things and you can
10　　leave. You're fired."
11　Q.　Have you told me everything that you remember
12　　that you said and that your husband said
13　　during that telephone call on the afternoon
14　　of Tuesday?
15　A.　I believe -- I think so, yes.
16　Q.　What next occurred, as you remember, that
17　　related to MedLabs or your claims in this
18　　case?
19　A.　My husband had got home from work that day,
20　　and he had wanted to speak with Pat to see
21　　exactly why I was fired. He called to the
22　　lab and spoke with Pat probably for 20 to
23　　30 minutes, had asked why I was fired. She
24　　had told him -- I'm only hearing his side of
25　　the conversation, mind you.

133

1　Q.　Okay; so this was not on the speaker phone?
2　A.　No.
3　Q.　You couldn't hear what Pat was saying?
4　A.　No.
5　Q.　All right. Well, then were you overhearing
6　　his discussion with Pat?
7　A.　Yes.
8　Q.　All right. After the phone call was over did
9　　you talk with him about what was said in
10　　that conversation?
11　A.　Yes.
12　Q.　Okay. What did he relay to you that was said
13　　in his conversation with Pat?
14　A.　He had asked why I was fired. Her response
15　　was "Because she left the workplace." I
16　　recall my husband saying that I was -- I
17　　was -- she was going to be calling back that
18　　evening to re- -- if I would reconsider
19　　counseling, I could have my job back.
20　Q.　Do you remember anything else that your
21　　husband told you about that discussion?
22　A.　I believe they chitchatted about comparing
23　　women working together and kids that he
24　　teaches. That's all I recall, and that she
25　　was going to call back Tuesday night

134

1　　after -- She had wanted him to have me
2　　reconsider counseling. She did call back --
3　　I believe it was around nine o'clock -- and
4　　asked if I had reconsidered, and I said,
5　　"No, we're just going to leave things where
6　　they're at", and that was it.
7　Q.　Was there -- Was that set time
8　　nine o'clock -- was that set in the
9　　conversation between Pat and your husband as
10　　you recall?
11　A.　I don't recall.
12　Q.　Now, at the time that your husband was
13　　relaying his discussion with Pat did you ask
14　　him any questions?
15　A.　I'm sorry. Can you repeat that?
16　Q.　When your husband was describing his
17　　discussion with Pat on that Tuesday
18　　afternoon, did you ask him any questions
19　　about the discussion?
20　A.　Yes, but I don't recall what they were.
21　Q.　Okay; so Pat called back, as had been
22　　discussed with your husband, on that Tuesday
23　　night?
24　A.　Yes.
25　Q.　And she asked if you had reconsidered, and

135

1　　your response was no, that you would leave
2　　things the way they were?
3　A.　Yes.
4　Q.　Is that the extent of that discussion with
5　　Pat?
6　A.　And I believe I had asked her about COBRA
7　　benefit papers and things like that, and she
8　　said, "I will mail them out to you", and
9　　that was it.
10　Q.　Were those things mailed to you?
11　A.　Yes.
12　Q.　You have learned, have you not, Ms. Jenkins,
13　　that both Beth and Julie were required to go
14　　to counseling?
15　A.　These last two days was the first thing --
16　　the first time I had heard that they went.
17　Q.　Do you think it was unreasonable for MedLabs
18　　to require that Julie and Beth go to
19　　counseling?
20　A.　No.
21　Q.　Do you know why MedLabs required Julie and
22　　Beth to go to counseling even after you had
23　　left the working environment?
24　A.　No, I don't.
25　Q.　When you were applying for work during the

136

1  spring of 2010, did you put down anybody as
2  a reference from MedLabs?
3  A. I can't recall; possibly Lori Allington, but
4  I can't be sure of that.
5  Q. Who is Lori Allington?
6  A. She is a lab tech that rotates through the
7  Marion site.
8  Q. How frequently would she have worked at the
9  Marion site?
10 A. Depending on what we needed for coverage, she
11 was there probably two to three times a
12 week.
13 Q. Would she have always worked at times that
14 you were working?
15 A. Unless it was my day off, you know.
16 Q. So she would cover for you from time to time?
17 A. Sure.
18 Q. Was that usually after you had worked a
19 weekend?
20 A. I believe so, or if I had a scheduled day off
21 or a vacation day.
22 Q. Did you ever speak with Lori Allington about
23 your concerns pertaining to the working
24 environment at MedLabs?
25 A. I can't recall.

137

1  Q. Did you ever speak with anybody else at
2  MedLabs regarding your concerns pertaining
3  to the working environment?
4  A. I can't recall. I don't believe so.
5  Q. Would you have -- Strike that. Did you speak
6  with Kristi Paterson at any time after that
7  Tuesday, the 13th of April, 2010?
8  A. Not that I remember.
9  Q. And your memory is that you would not have
10 put Kristi Paterson down as a reference or
11 you just don't have any recollection one way
12 or the other?
13 A. I've never put her down as a reference.
14 Q. Okay.
15 A. I put her down as a supervisor.
16 Q. So if you were seeking employment and when
17 you were seeking employment elsewhere during
18 the spring of 2010, you would have
19 identified Kristi Paterson as your
20 supervisor while at MedLabs?
21 A. Correct.
22 Q. To your knowledge did any of the prospective
23 employers with whom you were speaking
24 contact Kristi Paterson?
25 A. I had put no, that I didn't want them

138

1  contacting MedLabs.
2  Q. So on all of the employment papers that you
3  filled out seeking new work in the spring of
4  2010 you had indicated that you did not want
5  them to contact MedLabs?
6  A. Correct.
7  Q. To your knowledge was there ever any negative
8  reference given about you by MedLabs to any
9  of these prospective employers?
10 A. No.
11 Q. What were the reasons that you noted on your
12 employment applications that you did not
13 want any prospective employers contacting
14 MedLabs?
15 A. I had simply put that -- I had put I would be
16 happy to explain in an interview or a phone
17 call. That's how I responded to that
18 question on my applications.
19 Q. Now, prior to Friday, April 9, 2010, you
20 indicated that you were displeased with the
21 work environment at the Marion lab for a
22 period of weeks; is that correct?
23 A. Correct.
24 Q. All right. It would be a period of about
25 four weeks leading up to the events of

139

1  April 9?
2  A. About four weeks, yes.
3  Q. Okay; and what was done that caused you
4  concern during that four-week period of
5  time?
6     MR. REILLY: To the extent that she
7  hasn't already testified about that time
8  period? That's been asked and answered, but
9  you can go ahead and answer it again.
10    MR. JOHNSON: The question stands. Would
11 you like to have the question read back?
12    THE WITNESS: Please.
13    MR. JOHNSON: Would you read it back?
14    (The requested portion of the record was
15 read by the reporter.)
16 A. There was shortness on Beth and Julie's part
17 as far as answering, you know, work-related
18 questions. You could tell they were annoyed
19 with me because I was on work restrictions.
20 That's it.
21 BY MR. JOHNSON:
22 Q. Describe in detail how you believe there was
23 shortness on the part of Beth.
24 A. Barely asking -- answering a question,
25 considering we had been friends and I could

DEF APP 000080
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 83 of 99

140

1    see things were just going downhill since I
2    had been on work restrictions.  There was no
3    chitchat like we were friends before.  It
4    was just very tense, very quiet, a very
5    uncomfortable feeling.
6  Q.  What type of questions would you have asked
7    Beth that were answered in this short
8    fashion?
9  A.  You know, maybe patient questions such as
10   insurance or "How would you" -- "How would
11   you order this test?"  "Did I order this
12   right?"  "Do you want me to report out those
13   results for you while you're drawing a
14   patient?"
15 Q.  Now, you began that answer with "maybe", and
16   what I'm asking you is do you have a
17   specific recall today of what question or
18   questions you may have asked that you
19   believe were answered in a short fashion.
20 A.  I believe I can recall asking a question on
21   how to specifically order these blood tests
22   and getting no response as I'm looking at
23   her.
24 Q.  And that is something that you related about
25   the morning of Friday, April 9, 2010;

141

1    correct?
2  A.  That was that morning, yes.
3  Q.  All right.  Prior to that morning can you
4    recall any specific question that you asked
5    in that four weeks leading up to April 9?
6  A.  I don't recall.
7  Q.  It's just your general perception and belief
8    that when you asked questions of a business
9    nature, that the answers were given in a
10   short fashion to you?
11 A.  And with attitude, yes.
12 Q.  Okay.  What do you mean by "And with
13   attitude"?
14 A.  Exactly what I said, with attitude; just
15   like, "Well (indicating)", just real short.
16 Q.  And by "real short" you mean that there was
17   not a lot of detail in the answer, not a
18   lengthy answer; is that correct?
19 A.  No, just like, "Well, you should know that
20   kind of answer."
21 Q.  Your answer also was, quote, You could tell
22   they were annoyed with me because I was on
23   work restrictions, close quote.  Do you
24   remember giving that portion of your answer?
25 A.  I don't recall the annoyed part.

142

1  Q.  What, Ms. Jenkins, makes you believe that
2    either Beth and/or Julie were concerned with
3    you because of your work restrictions?
4  A.  What do you mean by "concerned"?
5  Q.  Well, you're the one that has testified that
6    in the four weeks period of time leading up
7    to April 9 that the working conditions at
8    the Marion lab were uncomfortable for you
9    and made so by Beth and Julie; correct?
10 A.  Correct.
11 Q.  All right; and you have attributed that
12   situation to your going on work restrictions
13   or having work restrictions; correct?
14 A.  That is when it -- it all started, yes.
15 Q.  Well, I'm asking you why is it that you
16   attribute that work environment to your work
17   restrictions.
18 A.  They had to do -- When I was restricted to
19   seated work only, they had to pick up the
20   slack basically and do all of the blood
21   draws, and I don't think that they liked
22   that.  They felt like I wasn't doing
23   anything.
24 Q.  Why is it that you say that you don't think
25   that they liked that?

143

1  A.  Because you could feel it.  There was extreme
2    tension.  There was shortness in answers,
3    rudeness.
4  Q.  Why is it that you have testified that you
5    felt that they believed you weren't doing
6    anything, the same reasons you've just
7    given?
8  A.  Yes.
9  Q.  Is the first time that you addressed these
10   concerns about their responsiveness in their
11   dealing with you the afternoon of Friday,
12   April 9?
13 A.  Yes.
14 Q.  So prior to the afternoon of April 9 you did
15   not take Beth aside and say, "Hey, we have
16   been friends.  I'm concerned.  Are you upset
17   with me?" or anything of that nature?  You
18   didn't have that discussion, did you?
19 A.  No.
20 Q.  The same with Julie, you didn't have that
21   discussion with Julie?
22 A.  No.
23 Q.  So the first time that the cat was out of
24   bag, so to speak, was on the afternoon of
25   Friday, April 9?

DEF APP 000081

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 84 of 99

144

1   A.   Yes.
2   Q.   And do I understand correctly, Ms. Jenkins,
3        that you believe that there is a -- what
4        would be called a temporal relationship, a
5        relationship in time with regard to your
6        work restrictions and the work environment
7        you've described?
8   A.   I don't understand the question.
9   Q.   Okay. That's fine. Can you provide any more
10       details to me aside from what you've already
11       testified to about why you thought the work
12       environment was unfavorable and unfriendly
13       to you for that four-week period of time
14       leading up to April 9?
15  A.   No.
16  Q.   Do I understand correctly, Ms. Jenkins, that
17       you previously had worked at Weland
18       Laboratories in Cedar Rapids?
19  A.   Yes.
20  Q.   And that was for a fairly extended period of
21       time, was it not?
22  A.   Yes.
23  Q.   What did you do there?
24  A.   I started out as a Medical Lab Technician,
25       rotating through one of their locations by

145

1        the pediatric center. That was my primary
2        location, and then in the afternoons I would
3        go to the main lab on 19th Street, and I
4        would work out front doing phlebotomy, and
5        then they had a full-time opening come up in
6        the back in cytology and histology, so I was
7        a cytology prep technician and I was also
8        cross-trained in histology.
9   Q.   And cytology is what?
10  A.   The study of cells. We would -- They prep
11       and -- They prep Pap smears and different
12       body fluids looking for cancers.
13  Q.   Histology is what?
14  A.   Histology is the study of the tissues. We
15       would get biopsies in and those would get
16       processed, tissues would get cut, then put
17       on slides and stained for the pathologist to
18       look and diagnose disease.
19  Q.   Were you the one that was doing some of the
20       cutting and staining and mounting of the
21       tissue samples?
22  A.   I was cross-trained to cut tissue and put
23       them on slides and stain them, yes.
24  Q.   Why is it that you left employment with
25       Weland Clinical Labs?

146

1   A.   I wanted to be a full-time lab technician
2        again.
3   Q.   Had you spoken with anybody at Weland
4        Clinical Labs about that?
5   A.   Yes.
6   Q.   And were they disinterested in having you be
7        a full-time technician?
8   A.   They had no openings. People don't leave
9        there. They retire there pretty much.
10  Q.   Had you started out as a lab technician
11       there?
12  A.   I did, but we also had children, and the
13       hours were lots of evenings, which wasn't in
14       the best interest of my family.
15       (Exhibit Number 36 was marked for
16       identification.)
17  Q.   Ms. Jenkins, I'm handing you what the
18       reporter has marked as Exhibit 36. I would
19       ask you to review that exhibit and let me
20       know once your review is completed, please.
21  A.   (Witness complied.) Okay.
22  Q.   This apparently is some type of what they
23       call a mailbox message; is that correct?
24  A.   Yes.
25  Q.   Was this an internal e-mail system for

147

1        MedLabs?
2   A.   Yes.
3   Q.   And this is a way of communicating internally
4        amongst the various labs of MedLabs; is that
5        correct?
6   A.   Yes.
7   Q.   All right. Now, this bears the date of
8        June 29, 2008; is that correct?
9   A.   Yes.
10  Q.   And it's from Jennifer Metzen?
11  A.   Yes.
12  Q.   Do you know who Jennifer Metzen is?
13  A.   I believe she oversees all of the clinics in
14       the various MedLabs.
15  Q.   Is this an e-mail that Jennifer Metzen sent
16       to you?
17  A.   Yes.
18  Q.   What did this relate to?
19  A.   2008. I believe it related to -- I felt that
20       I had some concerns as far as not having
21       enough help, and micro- -- microbiology was
22       one area that was super busy, and I felt
23       like I was very overwhelmed, and also the
24       Marion lab initially before they got moved
25       to their new location there was very limited

DEF APP 000082

Case 1:11-cv-00031-LRR-JSS    Document 10-3    Filed 03/19/12    Page 85 of 99

148

1    staffing. It was just one full-time person
2    I believe and a part-time person, which was
3    not enough help.
4  Q. And there is reference in this mailbox
5    message to you about frustrations caused by
6    being busy all day long, Monday through
7    Friday; is that correct?
8  A. Correct.
9  Q. Was that your situation?
10 A. Yes.
11 Q. There is a phrase that's contained within
12   quotation marks in this e-mail that reads,
13   quote, no one cares or is listening to your
14   needs, close quote. Did I read that
15   correctly?
16 A. Yes.
17 Q. It appears from this e-mail that Jennifer
18   Metzen is attributing that comment to you.
19   Would you read it that way?
20 A. Yes.
21 Q. Did you make a comment to that end?
22 A. I can't recall, but, yes, it seems like I was
23   frustrated because it was so incredibly
24   busy, too busy for one person, and I feel
25   like I had asked for help before and had got

149

1    no response.
2  Q. Now, Ms. Metzen makes a couple points in this
3    message to you. One is that everybody's
4    pretty busy at that point in time it sounds
5    like. Is that a fair statement?
6  A. Yes, but a lot of those locations have extra
7    help also.
8  Q. I see. So they weren't as busy as you?
9  A. I can't say whether they were or they
10   weren't. I don't recall.
11 Q. She also makes the comment at the end of the
12   e-mail that -- it reads, quote, I just feel
13   that the comment, quote, No one every
14   listens or cares, close quote, is not
15   necessarily warranted. Do you see that
16   statement by her?
17 A. I do.
18 Q. Did she express to you that she thought that
19   you were overreacting to the situation?
20 A. That's what this looks like it says.
21 Q. Okay. Did you disagree with her at that
22   point in time?
23 A. Yes, I did.
24 Q. Now, Ms. Jenkins, in the documents that
25   you've produced there are a number of these

150

1    mailbox messages that you authored,
2    primarily to Kristi Paterson. Do you
3    remember that you used this communication
4    tool as a regular way of communicating?
5  A. Yes.
6  Q. And a number of these e-mails or mailbox
7    messages, as they're called, related to your
8    workers' compensation claim and your
9    scheduling. Is that your recollection of
10   what documents --
11 A. Yes.
12 Q. -- were saved and provided to me?
13 A. Yes.
14 Q. Had you ever written Kristi Paterson a
15   mailbox message that said that you had
16   concerns with the work environment at the
17   Marion lab?
18 A. I don't believe so.
19 Q. Had you ever written Kristi Paterson that
20   said you had concerns about your
21   communications or relations with Beth at the
22   Marion lab?
23 A. No.
24 Q. Had you ever written to Kristi Paterson
25   telling her that you had concerns about your

151

1    communications or relations with Julie at
2    the Marion lab?
3  A. No.
4  Q. Had you ever written mailbox messages to Pat
5    that expressed those concerns about Beth?
6  A. No.
7  Q. Had you ever written any mailbox messages to
8    Pat that expressed those concerns about
9    Julie?
10 A. No.
11 Q. Had you ever written any mailbox messages
12   that expressed those concerns to anyone in
13   management about either Beth or Julie?
14 A. No.
15 Q. And do I understand correctly that you never
16   telephoned either Kristi or Pat to express
17   those concerns about Beth?
18 A. Not on the telephone, no.
19 Q. And you didn't telephone anybody else in
20   management at MedLabs to express those
21   concerns about --
22 A. No.
23 Q. -- that, did you?
24 A. No.
25 Q. Is the same true for Julie, you never

DEF APP 000083
Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 86 of 99

152

1    telephoned anyone in management to express
2    those concerns about Julie?
3  A. Correct.
4  Q. Is it a fair understanding, Ms. Jenkins, that
5    the first time that you raised an issue
6    about your concerns associated with Beth and
7    your concerns associated with Julie are when
8    you physically drove down to the main lab
9    the afternoon of Friday, April 9, 2010?
10 A. Yes.
11 Q. And that would be the one and only time that
12    you expressed those concerns to management,
13    would it not?
14 A. Yes.
15 Q. In terms of management style how would you
16    describe Kristi Paterson's management style?
17 A. **She's very nice, friendly. She seems very on**
18    **top of things.**
19 Q. Would you describe her as a very empathetic
20    person?
21 A. Yes.
22 Q. Is she an individual that you felt that if
23    you had concerns or issues, you could speak
24    with?
25 A. Yes.

153

1  Q. Was she primarily responsible for scheduling
2    issues regarding your work?
3  A. Yes.
4  Q. So if you had a day you wanted off or had a
5    particular day of the week you wanted to
6    schedule as off following a weekend, would
7    you communicate that to her?
8  A. Yes.
9  Q. All right; and Kristi would work with you to
10    have the schedule be as you wished it to be?
11 A. Yes.
12 Q. Can you remember any time, Ms. Jenkins, where
13    you wanted a particular day off that Kristi
14    was not able to accommodate your request?
15 A. No.
16 Q. I noticed in some of the materials that you
17    produced in this lawsuit there were two
18    different physical therapy groups that you
19    had dealt with in the course of about a
20    year's time. Do you recall that to be the
21    case?
22 A. Yes.
23 Q. And in both instances the physical therapy
24    reports indicated a concern for and a focus
25    on increasing your core strength. Do you

154

1    recall that?
2  A. Yes.
3  Q. All right. What do you understand core
4    strength to be?
5  A. **Your abdominal area.**
6  Q. Is it your understanding that core strength
7    has to do with structural stability of your
8    body?
9  A. Yes.
10 Q. Okay; and that includes structural stability
11    of your back?
12 A. Yes.
13 Q. All right. Was it your understanding that
14    both physical therapy experts found that you
15    had poor core strength?
16 A. Yes.
17 Q. And you needed to work on improving that core
18    strength?
19 A. Yes.
20 Q. All right. Were you given a regimen of
21    exercises to do in an effort to increase
22    your core strength?
23 A. Yes.
24 Q. All right. Are those exercises that you did
25    and that you followed?

155

1  A. **I did them for a few months, but the pain was**
2    **still there.**
3  Q. So you stopped doing them?
4  A. Yes.
5  Q. Since your departure from employment with
6    MedLabs have you been involved in any
7    physical therapy?
8  A. No.
9  Q. Do you have any reason to believe,
10    Ms. Jenkins, that your core strength is
11    improved over that which it was when you
12    were seen by those two different physical
13    therapy outfits?
14 A. **Yes, 'cause I have started working out a**
15    **little bit.**
16 Q. Okay; and your workouts, do they focus on
17    extremities or upon your core strength, or
18    what do they focus upon?
19 A. **A variety, arms, legs, yoga, cardio.**
20 Q. Are you doing anything in particular for your
21    abs?
22 A. **Just sit-ups.**
23 Q. Are you doing anything to develop strength in
24    your quadriceps?
25 A. **I do the elliptical a little bit.**

DEF APP 000084

160

1  certainly free to give your general
2  understanding of what you think that term
3  means.
4     MR. JOHNSON: Just for the record you
5  understand that I'm not asking you what
6  advice or what information was given to you
7  by your attorney.
8     THE WITNESS: Uh-huh; yes.
9     MR. JOHNSON: Okay. All right.
10  That's -- So that's a limitation on my
11  question, okay?
12     THE WITNESS: Okay.
13  A. **So you're asking me my definition of**
14     **harassment?**
15  BY MR. JOHNSON:
16  Q. Sure.
17  A. **Okay. Harassment, my definition would be**
18     **when you're in the workplace or anyplace for**
19     **that matter that somebody makes you feel**
20     **uncomfortable, mistreated, whether it be**
21     **physical, mental, emotional. That's what I**
22     **think it is.**
23  Q. Okay. There is also on page 2 of Exhibit 38
24     a check in the box that reads, Undesirable
25     Assignment/Transfer. Do you see that?

161

1  A. **Oh, yes.**
2  Q. All right. What was the undesirable
3     assignment/transfer to which you were
4     subjected by MedLabs?
5  A. **I don't understand the question.**
6  Q. Okay. Do you know what undesirable
7     assignment/transfer means?
8  A. **I'm not exactly sure, no.**
9  Q. Okay. Do you believe that your assignment to
10     work in the Marion lab was an undesirable
11     assignment?
12  A. **No.**
13  Q. Were you given the opportunity to transfer
14     out of the Marion lab if you so desired?
15  A. **I don't remember them stating that.**
16  Q. Did you ever request to be transferred out of
17     the Marion lab?
18  A. **No.**
19  Q. To your knowledge were you transferred to
20     some work location that you deemed to be
21     undesirable?
22  A. **No.**
23  Q. In the complaint that you filed with the
24     Court, Exhibit 10 --
25  A. **Okay.**

162

1  Q. Did you find it?
2  A. **Yes.**
3  Q. Okay. If you look at page 4, paragraph 21,
4     this is under the legal claim that you're
5     asserting, which is disability
6     discrimination. Do you see that?
7  A. **Yes.**
8  Q. All right; and paragraph 21 alleges that your
9     disability discrimination claim is based on
10     two prongs, one prong is the symptoms
11     associated with your back injury; is that
12     correct?
13  A. **Yes.**
14  Q. And the second prong is perceived
15     psychological problems; is that correct?
16  A. **Yes.**
17  Q. What were the perceived psychological
18     problems which you are alleging in
19     paragraph 21 of your complaint?
20  A. **When -- April 13th when Pat had pulled me**
21     **out -- outside to speak with me, her telling**
22     **me that I was being overmedicated.**
23  Q. Have you completed your answer?
24  A. **I'm thinking.**
25  Q. Okay.

163

1  A. **Overmedicated and that was causing me to be**
2     **overly sensitive and that I needed to work**
3     **on interpersonal relationships.**
4  Q. Have you now completed --
5  A. **And she had -- Sorry.**
6  Q. Please finish your answer.
7  A. **And being concerned about my weight loss.**
8     **That's it.**
9  Q. Okay; so there are what appears to be four
10     elements of this claim, one is
11     overmedicated, one is oversensitive, one is
12     need to work on interpersonal relationships,
13     and the last one is concern about your
14     weight loss; am I correct?
15  A. **Correct.**
16  Q. Okay. Are you testifying, Ms. Jenkins, that
17     Pat was telling you that you were
18     overmedicated or was asking whether you may
19     be overmedicated?
20  A. **She was telling me I was overmedicated.**
21  Q. Did she know what medications you were
22     taking?
23  A. **No.**
24  Q. Did she know that you had received
25     medications for your back injury?

DEF APP 000085

164

1  A.  I cannot recall.
2  Q.  Did she tell you that she had suffered with a
3      back injury in the past and had dealt with
4      medication issues?
5  A.  I don't recall.
6  Q.  Did Pat express concern to you about what
7      appeared to be a weight loss?
8  A.  She had mentioned, yes, that she was
9      concerned about my weight loss.
10 Q.  Okay. In this discussion when she was
11     talking about your weight loss, for example,
12     did you view her as criticizing you for
13     that?
14 A.  Yes, I did.
15 Q.  Did you view her as criticizing you for --
16     when -- on the issue of medications?
17 A.  Yes, I did.
18 Q.  Would it be a fair understanding that you
19     viewed all of these comments by Pat to be a
20     personal criticism directed to you?
21 A.  Yes.
22 Q.  All right; and it would also be fair to
23     understand that from your point of view this
24     was not an expression of care or concern by
25     Pat about you?

165

1  A.  Correct.
2  Q.  She didn't care about you from your point of
3      view?
4  A.  No, I don't believe so.
5  Q.  Okay; and so she was just sticking her nose
6      in business that was none of her business
7      and was just criticizing you when she was
8      talking to you about these events, these
9      matters; correct?
10 A.  She is not a physician. She cannot tell me
11     I'm overmedicated.
12 Q.  Was she sticking her nose in business that
13     wasn't hers when she was talking to you
14     about these issues?
15 A.  She maybe should have pulled me aside and
16     asked me.
17 Q.  So you didn't view any of her statements as
18     being questions or in the form of a
19     questioning of whether or not you may be
20     overmedicated, you viewed it as a statement
21     of fact?
22 A.  Yes.
23 Q.  But to your knowledge she had no basis to
24     know what medications you were taking;
25     correct?

166

1  A.  Correct.
2  Q.  From your point of view, Ms. Jenkins, were
3      you subject to improper treatment by the
4      request that you go to counseling?
5  A.  Yes.
6  Q.  From your point of view was Beth subject to
7      improper treatment by the request that she
8      go to counseling?
9  A.  I don't believe so.
10 Q.  From your point of view was Julie subject to
11     improper treatment by the request that she
12     go to counseling?
13 A.  No.
14 Q.  So is it a fair understanding, Ms. Jenkins,
15     that from your point of view the better way
16     to proceed on Tuesday, April 13 was for the
17     MedLabs management to have insisted that
18     Beth and Julie go to counseling but that you
19     would not be required to?
20 A.  I did not know they were going to counseling.
21     I was not told they were going to
22     counseling. Counseling was not brought up
23     until I was pulled out into the hall with
24     Pat.
25 Q.  Well, you've just testified, Ms. Jenkins,

167

1      that you thought it was proper for Beth to
2      be required to go to counseling; correct?
3  A.  Yes.
4  Q.  And you've just testified that you thought it
5      was proper for Julie to be required to go to
6      counseling?
7  A.  Yes.
8  Q.  All right; so sitting here today do you think
9      that what should have been done on Tuesday,
10     April 13, 2010, is that management of
11     MedLabs should have required Beth and Julie
12     to go to counseling but not have imposed
13     that requirement upon you?
14 A.  Correct. I did nothing wrong.
15 Q.  I understand correctly, Ms. Jenkins, that
16     in your discussion with Pat outside the
17     laboratory at Marion in discussing
18     counseling and your attending counseling,
19     when you refused to go to counseling, that's
20     when the subject came up that if you don't
21     go to counseling, you'll no longer work for
22     MedLabs occurred?
23 A.  Correct.
24 Q.  All right. Prior to mentioning of
25     counseling -- Well, strike that, please.

DEF APP 000086

Case 1:11-cv-00031-LRR-JSS   Document 10-3   Filed 03/19/12   Page 89 of 99

168

1   Was it your understanding as you walked back
2   into the laboratory on Tuesday afternoon,
3   April 13 of 2010, that because you refused
4   to go to counseling, that's why you lost
5   your job with MedLabs?
6 A.   I was told that I lost my job because I left
7   the workplace.
8 Q.   Well, is that what you were told outside of
9   the laboratory?
10 A.   No; counseling, I refused to go to
11   counseling.
12 Q.   All right; and as you were walking back in
13   the laboratory, was it your understanding
14   that you lost your job because you refused
15   to go to counseling?
16 A.   No, my understanding was because I left to go
17   report harassment downtown.
18 Q.   So irrespective of what was told to you just
19   minutes before that point in time, that your
20   employment was ended because you refused to
21   go to counseling, you attribute your
22   termination to reporting the incidents and
23   the events of Friday, the 9th?
24 A.   Rephrase that.
25 Q.   Sure. In the meeting with Pat outside the

169

1   laboratory on the afternoon of Tuesday,
2   April 13, 2010, you were told that if you
3   would not agree to go to counseling, that
4   your employment with MedLabs would cease;
5   correct?
6 A.   Correct.
7 Q.   All right. That was the only reason that you
8   were given in that discussion as to why your
9   employment would cease; is that correct?
10 A.   I don't believe that's correct.
11 Q.   Okay. What was said to you that indicated
12   that something else was causing you to lose
13   your job at MedLabs aside from your refusal
14   to go to counseling?
15 A.   I was told first thing when I walked out
16   there she was furious that I left the
17   work -- that I left the work site.
18 Q.   Did she say why?
19 A.   No.
20 Q.   Okay. Do you have any idea why she would
21   have been upset that you left the work site?
22 A.   I was following -- No, I was following proper
23   protocol.
24 Q.   So you view Pat's concern about your leaving
25   the work site as being irrational?

170

1 A.   Yes, I do.
2 Q.   Okay. Do I understand correctly that in that
3   meeting with Pat when it was both just you
4   and she, that when you told her that you
5   adamantly refused to go to counseling, she
6   said to you that if you don't go to
7   counseling, you won't have a job with
8   MedLabs anymore?
9 A.   Yes.
10 Q.   Is that correct?
11 A.   Yes.
12 Q.   Okay. She didn't say to you that if you
13   don't go to counseling and because you left
14   the work site on Friday, you don't have a
15   job with MedLabs anymore, did she?
16 A.   No.
17 Q.   Okay; so you're the one that's linking those
18   two things together as the reason for your
19   termination; correct?
20 A.   Correct.
21 Q.   In your interrogatories, specifically
22   Interrogatory No. 19 you were asked
23   questions with regard to your damages. I
24   have a copy of that interrogatory, if that
25   would be of benefit to you in responding to

171

1   questions about this.
2 A.   Yes.
3 Q.   Okay.
4 A.   Thank you.
5 Q.   I guess, first of all, if you just look at
6   page 1 and page 2, are these the
7   interrogatory answers that you provided and
8   that your signature was executed on
9   September 12, 2011?
10 A.   Yes.
11 Q.   Okay. If you go to Interrogatory No. 19,
12   which is the last -- second-to-last one, are
13   we on the same page?
14 A.   Yes.
15 Q.   Okay. This asks you to itemize in detail all
16   of the damages that you're claiming in this
17   litigation. Did you understand that at the
18   time?
19 A.   Yes.
20 Q.   Do you understand that now?
21 A.   Yes.
22 Q.   Okay. The second paragraph of your answer
23   asserts a claim of lost wages of $45,654; is
24   that correct?
25 A.   Yes.

DEF APP 000087

MARION FAMILY MEDICINE
2996 7th Avenue
Marion, IA 52302
(319)377-4844

Patient:   JENNIFER S. JENKINS
MRN:       ████████
DOB:       ████████
DOS:       Mar 8 2010

**Work Release**
This is to verify that JENNIFER JENKINS was seen in my office.  She has been/is under my care for injury. PT
needs to do seated work only. Pt will be re-evaluated on 3/18/10. If you have any questions please call the office at
319-377-4844.

*Laura Bertg RN*

Medlabs-2-000049

MARION FAMILY MEDICINE
2996 7th Avenue
Marion, IA  52302
(319)377-4844

Patient: JENNIFER S. JENKINS
MRN:
DOB:
DOS:    Mar 18 2010

Work Release
This is to verify that JENNIFER JENKINS was seen in my office.  She has been/is under my care for injury.  Pt
can not do any type of bending until she gets a SEI. She can sit  or stand to preform duties, just no bending.  If you
have further questions, please contact my office at 319-377-4844.

Medlabs-2-000050

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| JENNIFER S. JENKINS<br><br>    Plaintiff,<br><br>v.<br><br>MEDICAL LABORATORIES OF<br>EASTERN IOWA, INC.<br><br>    Defendant. | CIVIL CASE No. 1:11-31-LRR<br><br><br>AFFIDAVIT OF JULIE BEHR |

I, Julie Behr, do hereby depose and state on oath the following:

1. I am the Administrative Director of Medical Laboratories for Eastern Iowa ("MedLabs").

2. MedLabs provides laboratory analytical services to the medical community of Eastern Iowa.

3. For a number of years, MedLabs has maintained a series of locations wherein the public may walk-in for purposes of providing body specimens (*i.e.*, blood, urine, throat swabs, etc.) that are used in the testing and analysis. In other words, at each location of MedLabs, it is not known in advance how many patients will appear at any given time. If a flood of patients comes in for assistance around the same time, our professional staff has been educated and trained to quickly and effectively deal with each patient thereby obtaining the appropriate bodily specimen(s), properly labeling said specimen(s), and finalizing the documentation regarding the patient and the testing done in order to ensure proper traceability.

4. All such testing and analysis is done by MedLabs on the basis of a doctor's order. This testing and analysis is a part of the overall medical diagnostic and treatment care provided to patients.

1 | P a g e

5. Various of the laboratory analyses is used for the determination and treatment of all aspects of medical care, including the following areas:

   a. infectious diseases,

   b. assaying pharmaceutical treatment and dosage levels for patients,

   c. cardiac related diagnosis and treatment,

   d. cancer diagnosis and treatment, and

   e. diagnostic work for diseases and conditions of unknown etiology as the physician attempts to reach a formal diagnosis for a patient.

6. The main laboratory for MedLabs is located at 855 A Avenue NE, Cedar Rapids, Iowa.

7. At all times material, the Marion laboratory for MedLabs was located at 2996 7th Avenue, Marion, Iowa. The lab was housed in the same building as the Marion Family Medicine and Urgent Care medical clinic, and provided direct and expedited laboratory support to the physicians at that clinic. The support of this busy medical clinic is in addition to the walk-in patients that we see. As a result, the Marion laboratory has been and remains the busiest of all of the outreach laboratories of MedLabs.

8. Due to the fact that MedLabs is a medical service provider, the quality of care that we provide to the patients is paramount. A part of this quality care is to avoid undue delays. MedLabs has staffed its outreach laboratory locations so as to maintain the desired and expected level of quality care. Our Medical Assistants and Medical Laboratory Technicians are medical professionals. It is the expectation of MedLabs that each will do all possible to provide the quality patient experience to each of our patients. Simply departing from a laboratory without first contacting management and arranging coverage is not consistent with the level of patient care that we demand from our personnel and, further, is not consistent with the professionalism of the profession.

Further affiant sayeth not.

_Julie A Behr_
Julie Behr

**2 | P a g e**

DEF APP 000091

## NOTARY STATEMENT

On this __19__ day of March, 2012, Julie Behr appeared before me and voluntarily executed the foregoing document under oath.

JOHANNA SECL
Commission Number 734895
My Commission Expires
10-9-14

_Johanna C. Secl_
Notary Public,
State of Iowa

DEF APP 000092

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| JENNIFER S. JENKINS<br><br>     Plaintiff,<br><br>v.<br><br>MEDICAL LABORATORIES OF<br>EASTERN IOWA, INC.<br><br>     Defendant. | CIVIL CASE No. 1:11-31-LRR<br><br><br>AFFIDAVIT OF DARLA SPRATTE |

I, Darla Spratte, do hereby depose and state on oath:

1. During 2009 and 2010, I was a member of the management team of Medical Laboratories for Eastern Iowa ("MedLabs").

2. My role was to supervise all of the Medical Assistants throughout the entire organization. In this regard, I prepared the performance appraisals for all Medical Assistants and, further, would be involved with the scheduling of the Medical Assistants in conjunction with the Manager of Operations, Kristi Paterson, who was generally responsible to supervise the Medical Laboratory Technicians. The difference between the positions is primarily that a Medical Laboratory Technician could perform a greater array of laboratory tests as compared to a Medical Assistant.

3. I was the supervisor for Beth Schornhorst for years. Ms. Schornhorst is very competent and extremely well focused on providing quality patient care. It is important to her to keep things neat and well organized, and to provide the patient care services in a quick and efficient manner understanding this to be in the best interest of a positive patient experience with MedLabs.

4. I also supervised Julie Martin for years. Ms. Martin is a very competent and reliable employee. Ms. Martin's demeanor is one of calmness. She appears to always be under control, and is not a hot-head of any sort.

1 | P a g e

DEF APP 000093

5. Ms. Paterson supervised Jennifer Jenkins during her tenure with MedLabs.

6. On the afternoon of Friday, April 9, 2010, I received a telephone call from Ms. Martin. I distinctly remember the call starting with Ms. Martin stating, "You're not going to believe what happed…" Ms. Martin then proceeded to provide a summary of events that had just occurred with Ms. Jenkins, including telling me the following:

   a. Ms. Jenkins was obviously angry and upset and made a statement that she cannot work like this;
   b. Ms. Martin was more of an observer who had tried to calm Ms. Jenkins when the outburst occurred;
   c. Ms. Jenkins had been physically pursuing Ms. Schornhorst in the lab as Ms. Schornhorst backed away;
   d. Ms. Martin was very surprised by this outburst and did not understand what had triggered it; and
   e. Ms. Jenkins had left the work site after the outburst, apparently for the remainder of the day.

7. As of April 2010, I had been with MedLabs for over sixteen (16) years, and I have never known of an outburst like that of Ms. Jenkins to have previously occurred. Thus, this report of April 9 came as a surprise to me. Another reason for my surprise was that I had understood that all three were personal friends, and that they had socialized outside of work, including getting their families together.

8. In the call of April 9, Ms. Martin was also concerned about staffing of the Marion lab for the remainder of the day. Ms. Schornhorst was shortly scheduled to leave. It was well understood that after 4:00 pm, Friday afternoon could become very busy with walk-in patients and patients referred by the neighboring medical clinic. Ms. Jenkins had been scheduled to cover the busy period along with Ms. Martin.

9. After the call was concluded, I spoke with Pat Goehring, the Laboratory Manager of MedLabs. I believe that this was immediately after Ms. Goehring had visited with Ms. Jenkins on that Friday afternoon.

10. In this meeting with Ms. Goehring, the following was discussed:

DEF APP 000094

a. Ms. Goehring told me that unexpectedly, Ms. Jenkins had come to her office and was upset and tearful. It was further reported to me that Ms. Jenkins said that Ms. Schornhorst and Ms. Martin had "ignored" her and had been "mean" to her.

b. In my discussion with Ms. Goehring, it was the understanding of the both of us that the incident represented a personal dispute between three people who are required to function in a fast paced and close work environment.

c. At no time did Ms. Goehring mention that Ms. Jenkins had raised her back condition or work restrictions or otherwise related the incident with coworkers to be related to any medical conditions of Ms. Jenkins.

d. Ms Goehring was surprised that someone would simply walk away from a patient care position without insuring that there was coverage so as to maintain the quality of care provided to the patients of MedLabs. She thought such action very unprofessional, and that it was contrary to good patient care practices. I told her that I agreed.

e. Ms. Goehring also raised the potential of using the Employee Assistance Program at St. Luke's Hospital to work with all three of the employees in an effort to resolve the dispute and to prevent a recurrence. It was clear from Ms. Goehring's comments to me that she wanted to create an environment whereby the three employees could continue to work together if they so desired. From what I was told by Ms. Martin in the telephone call, and from what I was told by Ms. Goehring about her discussion with Ms. Jenkins, I thought that the involvement of the Employee Assistance Program was both reasonable and a sound management approach to the issue that had suddenly arisen.

f. The final matter that we discussed was the potential staffing needs at the Marion lab in the event that one or more of the employees decided that they wanted to transfer to a different location or refused to participate in the use of the Employee Assistance Program to seek resolution of the dispute.

11. When I left Ms. Goehring's office late in the afternoon of Friday, April 9, 2010, I had a clear understanding that Ms. Goehring was going to require that all three employees – Ms. Jenkins, Ms. Schornhorst, and Ms. Martin – engage in the process with the Employee Assistance Program. I also understood that even though two of the three employees were direct reports to me, Ms. Goehring was

3 | Page

going to handle the matter so as to impress the importance of the issue to MedLabs.

12. On the afternoon of Tuesday, April 13, 2010, Ms. Goehring told me that she had met with all three of the employees at the Marion lab where she told all three that it had been decided that in order to resolve the dispute and prevent a recurrence, involvement with the Employee Assistance Program would be required of each of them. Ms. Goehring further reported that Ms. Schornhorst and Ms. Martin had agreed, but that Ms. Jenkins had refused to be involved with the Employee Assistance Program. Ms. Goehring told me that she was giving Ms. Jenkins further time to consider this, and would be calling her during the evening of the 13th.

13. Later in the evening of the 13th, I received a call from Ms. Goehring who told me that Ms. Jenkins continued in her refusal to participate with the Employee Assistance Program and, as a result, she was no longer working for MedLabs. We then discussed issues pertaining to staffing of the Marion lab so that our patients would continue to receive the quality patient care that they expected from MedLabs.

Further affiant sayeth not.

_Darla Spratte_
Darla Spratte

## NOTARY STATEMENT

On this 19 day of March, 2012, Darla Spratte appeared before me and voluntarily executed the foregoing document under oath.


**JOHANNA SECL**
Commission Number 734895
My Commission Expires
12-9-14

_Johanna C. Sd_
Notary Public,
State of Iowa

4 | Page